## GILL v. UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 85. Argued November 21, 22, 1895. — Decided January 6, 1896.

An employé, paid by salary or wages, who devises an improved method of doing his work, using the property or labor of his employer to put his invention into practical form, and assenting to the use of such improvements by his employer, cannot entitle himself, by taking out a patent for such invention, to recover a royalty or other compensation for such use.

A person looking on and assenting to that which he has power to prevent is precluded from afterwards maintaining an action for damages.

*Solomons* v. *United States*, 137 U. S. 342, affirmed and applied to this case.

THIS was a suit by Gill to recover of the United States the sum of $94,693.04 upon an implied contract for the use of certain machines covered by letters patent issued to the claimant.

The petition alleged in substance that from March, 1864, to March, 1881, the claimant was employed as machinist, foreman, and draftsman at the Frankford Arsenal in the State of Pennsylvania, and since March, 1881, as master armorer at such arsenal, receiving during the term of his employment a *per diem* compensation for his services. His engagement required him to perform manual labor and to exercise his mechanical skill in the service of the government, but did not require the exercise of his inventive genius in such service, nor secure to the government the right to use any of his inventions without compensation.

That at sundry times from 1869 to 1882, six patents were granted to him for a cartridge-loading machine, a weighing machine, a gauging machine, a cartridge anvil, a heading machine, and a priming tool for reloading; that at different times he assigned to individuals or corporations all these inventions, but reserved to the government the right to use them.

The petition further alleged that the reasonable value of such use by the government amounted to the sum of

$94,693.04, no part of which had ever been paid; that no action upon the claim had been had in any department of the government beyond repeated acknowledgments, by the Ordnance Department, of claimant's right to compensation for the use of the inventions.

The government made a general denial of the allegations of the petition, and submitted the case to the Court of Claims, which made a finding of facts, the material portions of which are printed in the margin,[1] and entered a judgment dismissing

[1] (1) During the period of time within which the claimant invented the devices hereafter mentioned he was in the defendants' employment, and received wages, or a salary, for his services. The terms of his employment required him to exercise his mechanical skill in the service of the defendants, but did not require the exercise of his inventive genius in such service, nor secure to the defendants the right to use any inventions of the claimant without compensation therefor.

Letters patent of the United States were granted to the claimant, while in the service of the defendants, as follows: No. 97,904, dated December 14, 1869, for a cartridge-loading machine; No. 185,858, dated January 2, 1877, for a cartridge-weighing machine; No. 208,903, dated October 15, 1878, for a cartridge-gauging machine; No. 220,472, dated October 14, 1879, for a cartridge anvil; No. 241,962, dated May 24, 1881, for a cartridge-heading machine; No. 257,860, dated May 16, 1882, for a priming tool for reloading.

(2) The manner in which the inventions above referred to originated and came into the use of the government was as follows:

In 1867 the claimant, being a machinist or skilled mechanic in the Frankford Arsenal and getting as compensation $4 a day, came to General Benét, the commanding officer, and suggested that an improvement could be made in the method of loading cartridges, and exhibited to the commanding officer then or subsequently his device for an improvement which is now embodied in patent No. 97,904.

General Benét, after due examination and consideration, authorized the construction of such a machine. The machine was built at a cost of $500 by the United States according to the design of the claimant. On its completion it proved to be thoroughly satisfactory to the commanding officer, who authorized the construction of a second machine. The construction of both took place under the immediate supervision of the claimant, and such supervision was a part of his ordinary duty and employment. Subsequently successive commanding officers ordered from time to time six other machines to be constructed, which in like manner were built under the immediate supervision of the claimant, and all of these eight machines were completed prior to the claimant filing his application for a patent.

After his patent had been issued a ninth machine was also ordered, and

the claim upon the ground that where an employé of the government takes advantage of his connection with it to introduce an unpatented device into the public service, giving no intimation, at the time, that he regards it as property or that he intends to protect it by letters patent, but allows the government to test the invention at its own exclusive cost and risk by constructing machinery and bringing it into practical use before he applies for a patent, the law will not imply a contract; and that a contract will not be implied in favor of an employé who has thus placed a patented device in the public service as to machines constructed and used after his patent has been obtained.

---

in like manner constructed under the immediate supervision of the claimant. These machines have been used by the government at the Frankford Arsenal in the manufacture of cartridges, and continue in use to the present time.

(3) At no time did the claimant ever bring his invention before a commanding officer or other agent of the government as a subject of purchase and sale ; nor did he ever raise an objection to the use of the invention as set forth in the preceding finding; nor did he ever enter into an express agreement, written or oral, whereby a license was granted or intended to be granted to the government to operate and use the machine described in the preceding finding, or whereby the claimant waived or intended to waive his legal or equitable right, if any, to compensation; nor did any commanding officer ever undertake or assume to incur a legal or pecuniary obligation on the part of the government for the use of the invention or the right to manufacture thereunder.

The claimant was not employed to make inventions nor assigned to that duty, and his invention, until it was reduced to paper in the form of an intelligible drawing, was made out of the hours of labor at the arsenal and during the time which was properly his own, and the thought and time which he devoted to it were voluntarily given, as a good and earnest servant of the government, intent on rendering more effective the work and machinery of the arsenal with which he was connected, and the work of so devising a machine was not an obligation imposed upon him by the authorities of the arsenal.

(4) The other inventions of the claimant, set forth in the patents enumerated in finding I, except that of the heading machine, which was fabricated and used by the defendants under the supervision of the claimant, were also brought to the attention of the various commanding officers by suggestions from the claimant for making the means and appliances at the arsenal more efficient than they were; and in like manner the cost of preparing patterns for the iron and steel castings and of preparing working

From this decree the claimant appealed to this court.

*Mr. Halbert E. Paine* for appellant.

*Mr. Assistant Attorney General Dickinson* for appellees.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case raises the question, which has been several times presented to this court, whether an employé paid by salary or wages, who devises an improved method of doing his work, using the property or labor of his employer tó put his invention into practical form, and assenting to the use of such improvements by his employer, may, by taking out a patent

---

drawings and of constructing working machines was borne exclusively by the government; but the claimant did not use any property of the defendants, or the services of any employé of the defendants, in making or developing or perfecting the inventions themselves. In each case one or more machines, or articles of manufacture embodying the invention, had been constructed and was in operation or use in the arsenal with the claimant's knowledge and assent before he filed an application for a patent.

(5) In 1867, when the claimant made his first invention described in the patents hereinbefore enumerated, he was a machinist rated as a skilled laborer in the Frankford Arsenal, but acting and doing the duty of a master armorer, on wages of $4 a day. From time to time his wages were advanced until they became, in 1881, $6 a day, and he was in 1881 appointed master armorer, the duties of which are a general supervision of the shops. This increase of pay and advancement of position came through and by authority of the commanding officers of the arsenal, and the consideration or reason therefor was that the claimant was a faithful, intelligent, and capable employé, whose services were of great value to the government.

It was never stipulated by any commanding officer, nor understood or agreed to by the claimant, that the advance of wages was to be a consideration for the use of his inventions, though the practical ability of the claimant as an inventor, and the value of his inventions to the government, did operate upon the minds of the officers in estimating the claimant's services and ordering his advancement.

(6) The claimant has sold the right to use his inventions, reserving the right to the government as set forth in finding VII, to various persons for sums amounting in the aggregate to $5380. But the use of the inventions by private manufacturers is not nearly so large as the use by the government, the inventions being specially adapted to military purposes and appliances.

upon such invention, recover a royalty or other compensation for such use. In a series of cases, to which fuller reference will be made hereafter, we have held that this could not be done.

The principle is really an application or outgrowth of the law of estoppel *in pais*, by which a person looking on and assenting to that which he has power to prevent, is held to be precluded ever afterwards from maintaining an action for damages. A familiar instance is that of one who stands by, while a sale is being made of property in which he has an interest, and makes no claim thereto, in which case he is held to be estopped from setting up such claim. The same principle is applied to an inventor who makes his discovery public, looks on and permits others to use it without objection or assertion of a claim for a royalty. In such case he is held to abandon his inchoate right to the exclusive use of his invention, to which a patent would have entitled him, had it been applied for before such use. As was said by Mr. Justice Story in *Pennock* v. *Dialogue*, 2 Pet. 1, 16 : "This inchoate right, thus once gone, cannot afterwards be resumed at his pleasure, for where gifts are once made to the public in this way they become absolute." "It is possible," said the trial court, in charging the jury, "that the inventor may not have intended to give the benefit of his discovery to the public; and may have supposed that by giving permission to a particular individual to construct for others the thing patented he could not be presumed to have done so. But it is not a question of intention which is involved in the principle we have laid down, but of legal inference, resulting from the conduct of the inventor, and affecting the interests of the public. It is for the jury to say whether the evidence brings this case within the principle which has been stated." This language was quoted with approval in *Grant* v. *Raymond*, 6 Pet. 218. So, also, in *Shaw* v. *Cooper*, 7 Pet. 292, 323, it was held directly that "whatever may be the intention of the inventor, if he suffers his invention to go into public use, through any means whatsoever, without the immediate assertion of his right, he is not entitled to a patent."

The application of this principle to a single individual whom the patentee has permitted to make use of his invention without claiming compensation therefor, first arose in *McClurg* v. *Kingsland*, 1 How. 202. In this case the patentee Harley was employed by the defendants at their foundry upon weekly wages. While so employed, he invented the patented improvements, making experiments in the defendants' foundry, and wholly at their expense. The result proving useful, his wages were increased. He continued in their employment, during all of which time he made rollers for them, spoke about procuring a patent, and finally made an application, which was granted. He assigned the patent to the plaintiffs, after the defendants had declined his proposition that they should take out a patent, and purchase his right. He made no demand upon them for compensation for using his improvement, and gave them no notice not to use it, until a misunderstanding had arisen, when he left their employment, and made an agreement with plaintiffs to assign his right to them. The defendants continuing to make the rollers on his plan, the action was brought by the plaintiffs, without any previous notice by them. It was held that the facts above stated justified the presumption of a license to use the invention, and that the charge of the court, that the defendants might continue to use it without liability to the plaintiffs, was correct.

In the case of *Solomons* v. *United States*, 137 U. S. 342, one Clark, who was in the employ of the government as Chief of the Bureau of Engraving and Printing, conceived the idea of a self-cancelling stamp, and prepared a die or plate therefor, making use of the services of the employés of the Bureau and the property of the government. While his application for a patent was pending, he assigned his rights to the appellant Solomons, in payment of an account between them. On taking out the patent, the appellant notified the Commissioner of Internal Revenue that he was the owner of the patent, and demanded compensation for the use of the stamp on whisky barrels. It further appeared that Mr. Clark, as Chief of the Bureau, had been assigned the duty of devising a stamp for this purpose, and it was not understood or intimated that the

stamp which he was to devise should be patented, or become his personal property. Indeed, before the final adoption of the stamp, he said that the design was his own, but he should make no charge to the government therefor, as he was employed on a salary by the government, and had used its machinery and other property in the perfection of the stamp. It was held that, having been employed and paid to devise a new stamp, the invention, when accomplished, became the property of the government, and that the patentee had practically sold in advance whatever he might be able to accomplish in that direction.

A similar case was that of the *Lane & Bodley Company* v. *Locke*, 150 U. S. 193, in which an engineer and draftsman at a fixed salary, in the employ of the defendants, and using their tools and patterns, invented a stop-valve, which the firm used with his knowledge in certain elevators constructed by them until its dissolution, and after that, a corporation organized by the firm used it in the same way and with the like knowledge. It was held that the patentee, having made no claim for remuneration for the use of the patent, saying that he did not desire to disturb his friendly relations with the firm, might be presumed to have recognized an obligation to permit them to use the invention.

In *McAleer* v. *United States*, 150 U. S. 424, there was an express license by an employé in the Treasury Department, to such department and its bureaus, of a right to make and use machines containing the improvements of the patentee to the end of the patented term, and it was held that this agreement could not be varied by parol evidence that it was to terminate upon the discharge of the patentee from the employment of the government.

In *Keyes* v. *Eureka Mining Co.*, 158 U. S. 150, a person in the employ of a smelting company invented a new method of withdrawing molten metal from a furnace, took out a patent for it, and permitted his employer to use it without charge so long as he remained in its employ, which was about ten years. It was held that there was at least an implied license to use the improvement without payment of royalties during

the continuance of his employment, and also a license to use the invention upon the same terms and royalties fixed for other parties, from the time the patentee left the defendant's employment.

An attempt is made to differentiate the case under consideration from those above cited in the fact, stated in the third finding, that the invention in this case, until it was reduced to paper, in the form of an intelligible drawing, was made out of the hours of labor at the arsenal, and during the time which properly belonged to the patentee, and that, by finding four, "the claimant did not use any property of the defendants or the services of any of the employés of the defendants in making, or developing, or perfecting the inventions themselves." This, however, must be taken in connection with the further finding that "the cost of preparing patterns for the iron and steel castings, and of preparing working drawings, and of constructing machines was borne exclusively by the government," and that in each case, one or more machines or articles of manufacture embodying the invention, had been constructed and was in operation or use in the arsenal with the claimant's knowledge and consent before he filed an application for a patent. The inference to be deduced from the findings is, in substance, that, while the claimant used neither the property of the government, nor the services of its employés in conceiving, developing, or perfecting the inventions themselves, the cost of preparing the patterns and working drawings of the machines, as well as the cost of constructing the machines themselves that were made in putting the inventions into practical use was borne by the government, the work being also done under the immediate supervision of the claimant.

There is an assumption by the claimant in this connection that, if he did not make use of the time or property of the government in conceiving and developing his ideas, the fact is an important one as distinguishing this case from those above cited. In view of the finding that he did make use of the property and labor of the government in preparing patterns and working drawings and constructing his working

machines, the distinction is a very narrow one — too narrow we think to create a difference in principle, or to prevent the application of the rule announced in those cases. In *Solomons case* the finding was that, while employed as Chief of the Bureau of Engraving and Printing, Clark conceived the idea of a self-cancelling stamp, and under his direction the employés of that bureau, using government property, prepared a die or plate, and put into being the conception of Mr. Clark.

In every case, the idea conceived is the invention. Sometimes, as in the case of *McClurg* v. *Kingsland*, a series of experiments is necessary to develop and perfect the invention. At other times, as in the case under consideration, and apparently in the *Solomons case*, the invention may be reduced to paper in the form of an intelligible drawing, when nothing more is necessary than the preparing of patterns and working drawings, and the embodiment of the original idea in a machine constructed accordingly. Now, whether the property of the government and the services of its employés be used in the experiments necessary to develop the invention, or in the preparation of patterns and working drawings, and the construction of the completed machines, is of no importance. We do not care, in this connection, to dwell upon the niceties of the several definitions of the word "develop" as applied to an invention. The material fact is that, in both this and the *Solomons case*, the patentee made use of the labor and property of the government in putting his invention into the form of an operative machine, and whether such employment was in the preliminary stage of elaborating and experimenting upon the original idea, putting that idea into definite shape by patterns or working drawings, or finally embodying it in a completed machine, is of no consequence. In neither case did the patentee risk anything but the loss of his personal exertions in conceiving the invention. In both cases, there was a question whether machines made after his idea would be successful or not, and if such machines had proven to be impracticable, the loss would have fallen upon the government.

In this connection, too, it should be borne in mind that the

act, upon which so much stress has been laid by both sides, that the patentee made use of the property and labor of the government in putting his conceptions into practical shape, is important only as furnishing an item of evidence tending to show that the patentee consented to and encouraged the government in making use of his devices. The ultimate fact to be proved is the estoppel, arising from the consent given by the patentee to the use of his inventions by the government, without demand for compensation. The most conclusive evidence of such consent is an express agreement or license, such as appeared in the *McAleer* case; but it may also be shown by parol testimony, or by conduct on the part of the patentee proving acquiescence on his part in the use of his invention. The fact that he made use of the time and tools of his employer, put at his service for the purpose, raises either an inference that the work was done for the benefit of such employer, or an implication of bad faith on the patentee's part in claiming the fruits of labor which technically he had no right to enlist in his service.

There is no doubt whatever of the proposition laid down in *Solomons case*, that the mere fact that a person is in the employ of the government does not preclude him from making improvements in the machines with which he is connected, and obtaining patents therefor, as his individual property, and that in such case the government would have no more right to seize upon and appropriate such property, than any other proprietor would have. On the other hand, it is equally clear that, if the patentee be employed to invent or devise such improvements his patents obtained therefor belong to his employer, since in making such improvements he is merely doing what he was hired to do. Indeed, the *Solomons* case might have been decided wholly upon that ground, irrespective of the question of estoppel, since the finding was that Clark had been assigned the duty of devising a stamp, and it was understood by everybody that the scheme would proceed upon the assumption that the best stamp which he could devise would be adopted and made a part of the revised scheme. In these consultations it was understood that he was acting in

his official capacity as Chief of the Bureau of Engraving and Printing, but it was not understood or intimated that the stamp he was to devise would be patented or become his personal property. In fact, he was employed and paid to do the very thing which he did, viz., to devise an improved stamp; and, having been employed for that purpose, the fruits of his inventive skill belonged as much to his employer as would the fruits of his mechanical skill. So, if the inventions of a patentee be made in the course of his employment, and he knowingly assents to the use of such inventions by his employer, he cannot claim compensation therefor, especially if his experiments have been conducted or his machines have been made at the expense of such employer.

The following remarks of the court in the *Solomons case* (page 346) are pertinent in this connection: "So, also, when one is in the employ of another in a certain line of work, and devises an improved method or instrument for doing that work, and uses the property of his employer and the services of other employés to develop and put in practical form his invention, and expressly assents to the use by his employer of such invention, a jury, or a court trying the facts, is warranted in finding that he has so far recognized the obligations of service flowing from his employment and the benefits resulting from the use of the property and the assistance of the coemployés of his employer, as to have given to such employer an irrevocable license to use such invention."

The acquiescence of the claimant in this case in the use of his invention by the government is fully shown by the fact that he was in its employ; that the adoption of his inventions by the commanding officer was procured at his suggestion; that the patterns and working drawings were prepared at the cost of the government; that the machines embodying his inventions were also built at the expense of the government; that he never brought his inventions before any agent of the government as the subject of purchase and sale; that he raised no objection to the use of his inventions by the government; and that the commanding officer never undertook to incur a legal or pecuniary obligation on the part of the gov-

ernment for the use of the inventions or the right to manufacture thereunder. It further appeared that from time to time his wages were advanced from four to six dollars a day, and while it was never stipulated by the commanding officer, or understood by the claimant, that the advance of wages was a consideration for the use of the inventions, the practical ability of the claimant as an inventor, and the value of his inventions to the government, did operate on the minds of the officers in estimating the claimant's services and ordering his advancement.

Clearly, a patentee has no right, either in law or morals, to persuade or encourage officers of the government to adopt his inventions, and look on while they are being made use of year after year without objection or claim for compensation, and then to set up a large demand, upon the ground that the government had impliedly promised to pay for their use. A patentee is bound to deal fairly with the government, and if he has a claim against it, to make such claim known openly and frankly, and not endeavor silently to raise up a demand in his favor by entrapping its officers to make use of his inventions. While no criticism is made of the claimant, who was a simple mechanic, and, as found by the Court of Claims, "a faithful, intelligent, and capable employé, whose services were of great value to the government," and whose conduct was "fair, honest, and irreproachable," and while the government appears to have profited largely by his inventive skill, we are of opinion, for the reasons above stated, that the appeal in his behalf should be addressed to the generosity of the legislative, rather than to the justice of the judicial department.

It may be added, in this connection, that the inventions which the claimant suggested to the commanding officer to adopt were mere undeveloped conceptions of his own, that had never been embodied in a machine; that it was uncertain at this time whether he could or would obtain patents for them. If he did not obtain patents, their use was open to anybody. Under such circumstances, it is impossible to say that an officer of the government, conceiving that he had full authority

to make use of them, agreed by their adoption to pay for the value of the use of such machines under patents that might be applied for and granted in the future.

We are clearly of opinion that the case is covered by our former decisions, and that the judgment of the court below must be

*Affirmed.*