AMDYCO CORPORATION v. URQUHART
et al.

No. 4553.

District Court, E. D. Pennsylvania.

April 8, 1930.

W. Brown Morton (of Pennie, Davis Marvin & Edmonds), of New York City, Boyd Lee Spahr, of Ballard, and Spahr, Andrews & Ingersoll, of Philadelphia, Pa., for plaintiff.

J. Claude Bedford, of Philadelphia, Pa., for defendant Urquhart.

Joseph G. Denny, Jr., of Philadelphia, Pa., for defendant American Fomon Co.

THOMPSON, District Judge.

This suit in equity was brought by the plaintiff against the defendants praying for a decree adjudging the plaintiff the equitable owner of an application for letters patent, Serial No. 69,559, filed by the defendant Radcliff Morris Urquhart November 17, 1925, for an improvement in a method and apparatus for extinguishing fires, upon the ground that the plaintiff is the lawful owner thereof by reason of the fact that the defendant Urquhart was in the employ of the plaintiff or its predecessor, the American Dyewood Company, when he made the invention and discoveries which are the subject-matter of the application.

From the pleadings and proofs, it appears that Urquhart in 1922, being interested in the production of fire-extinguishing foam, took up with the American Dyewood Company the subject of producing materials for stabilizing fire-extinguishing foam. The American Dyewood Company was engaged in extracting dyes and other essences from wood. A Mr. Blagdon, vice president and general manager of the company, took Mr. Urquhart to the company's plant at Chester, Pa., and, after numerous visits and experiments, the company produced a satisfactory liquid extract suitable as a foam stabilizer. Urquhart's business was the sale of foam-forming compounds for introduction into water to be projected in a stream through a hose for extinguishing fire, the air in the foam causing a blanket which prevents the growth or spreading of fire and thus causes its extinction. The object of the stabilizer was to prevent the breaking up of the foam by means of some extract, for instance that of licorice root, which would render the foam stable and prevent its disintegration. At the outset, the purpose of the parties was that the Dyewood Company would manufacture such wood extracts for Urquhart to be used in his business, but later, after Mr. Blagdon had assured Urquhart that he would be protected from having his stabilizer ideas appropriated, the president of the Dyewood Company informed him that they intended

to sell the stabilizer to others and offered Urquhart the position of sales manager of the stabilizer department of their business, which they were about to organize. As a consequence of negotiations between the parties, a contract in writing was entered into between the Dyewood Company and Urquhart, under which Urquhart was employed as a sales manager of the "Fyrout" department of the company, under which he was to receive commissions on all sales of the stabilizing product which they called "Fyrout" and a salary of $500 per month. The contract is as follows:

"Agreement made this 7th day of June, 1923, between American Dyewood Company, a corporation of the State of Pennsylvania, (hereinafter called the Company) party of the first part and R. M. Urquhart, now of the City of Philadelphia, State of Pennsylvania (hereinafter called Mr. Urquhart) party of the second part:

"Whereas, Mr. Urquhart, in or about the month of August, 1922, suggested to the Company that it might advantageously engage in the manufacture of a product now known as "Fyrout" and since that time Mr. Urquhart has cooperated with the Company in relation thereto and the product is now ready for the market, and whereas it is the desire of the Company and of Mr. Urquhart to enter into this contract fixing the terms of their relationship:

"Now therefore in consideration of the foregoing and of the mutual covenants herein contained, it is agreed as follows:

"First: Mr. Urquhart is to be the Sales Manager of the "Fyrout" department of the Company and sell the product known as "Fyrout," subject at all times to the direction of the Company. Mr. Urquhart is to devote his entire time to selling the product and traveling in such territory as the Company may consider as advantageously to be canvassed. All sales are to be made and prices to be upon terms to be fixed and approved by the company and under forms of contracts prescribed and approved by the company. Mr. Urquhart will, from time to time, make reports of all sales and forward to the head office of the Company copies of all such contracts. This engagement of Mr. Urquhart is to continue for a period of one year from May 1st, 1923. If Mr. Urquhart or the Company may wish to terminate his employment on or after May 1st, 1924, he or it shall give to the other six months written notice of such desire, and at the termination of said six months his employment as sales manager of the "Fyrout" Department shall terminate.

"Second: Company agrees to pay Mr. Urquhart:

" (a) The usual necessary traveling expenses incurred in the conduct of such business, upon statements to be rendered by him weekly. This is to continue so long as he is in the employ of the company.

"(b) Commissions on all sales of the product "Fyrout" made by the Company until the termination of this agreement, such commissions to be upon the following gross sale price basis:

"On all sales at 10 cents or over per pound 8%.

"On all sales at 9 cents and under 10 cents per pound 7%.

"On all sales at 8 cents and under 9 cents per pound 6%.

"On all sales at 7 cents and under 8 cents per pound 5%.

"On all sales at 6 cents and under 7 cents per pound 4%.

"On all sales at 5 cents and under 6 cents per pound 3%.

"On all sales at 4 cents and under 5 cents per pound 2%.

"On all sales under 4 cents per pound 1½%.

"At the end of each quarter, the company will prepare a statement of commissions earned by Mr. Urquhart, and will pay to Mr. Urquhart the amount of such commissions. The payment of these commissions is to continue for a period of at least five years—that is to say until May 1st, 1928. This payment of commissions is to continue whether Mr. Urquhart remains in the employ of the company or not, provided that the contract as to Mr. Urquhart's engagement under salary is terminated by the company and not by Mr. Urquhart, but such payment of commissions is, however, upon condition that Mr. Urquhart shall not, during the said period expiring May 1st, 1928, sell or aid in the sale or manufacture of any product which competes in any way with the said "Fyrout."

"(c) Salary at the rate of five hundred dollars ($500) per month, beginning as of date May 1st, 1923, and shall continue at least for a period of one year, that is, until May 1st, 1924.

"In witness whereof the parties hereto have duly executed this agreement the day and year first above written.

"American Dyewood Company

"By Dewitt Clinton Jones, Vice President.
"Attest: Ernest W. Picker, Secretary.
"[Corporate Seal.]
"R. M. Urquhart."

rp.

The stabilizer was first made in the form of a liquid extract, but, at Urquhart's suggestion, was afterward manufactured in dry form. The company also took up the business of selling chemical substances such as aluminum sulphate and bicarbonate of soda, which, when introduced into water, produce foam. Urquhart, in addition to his regular duties as sales manager, took an active interest in assisting the company to devise and produce apparatus and equipment for experimenting with foam, although the company did not, until later, engage in the manufacture or sale of equipment.

The business prospered to such an extent, by reason of Urquhart's enthusiasm and interest, that the Dyewood Company formed a subsidiary corporation known as Amdyco Corporation, in which it owned all the capital stock, and which it conducted as a separate department of its business. It named its product "Amdyco." That fact was announced to the trade by the Dyewood Company on April 1, 1925, and the Amdyco Corporation at the same time announced to the oil industry the establishment of complete fire-prevention and fire-protection service, the making of recommendations for instruction of employees in fire-prevention measures, and the use of fire-prevention apparatus. Urquhart was designated as president of the Amdyco Corporation, but received no other or different compensation than that provided by the written contract above set out, and on April 1, 1925, under agreement between the Dyewood Company and Urquhart, the contract was assigned to the Amdyco Corporation.

The terms of the contract between the parties were carried out in this manner until some time in the early part of 1926 when, unknown to Urquhart, negotiations were being carried on by the plaintiff with the Foamite-Childs Corporation, which was engaged in the same business as the Amdyco Corporation and was its competitor, as a result of which, on July 8, 1926, the Foamite-Childs Corporation took over the entire business of the Amdyco Corporation under an exclusive license to sell. When this transaction, throwing him out of employment, became known to Urquhart, he on July 20, 1926, tendered his resignation as president of the Amdyco Corporation, stating his reasons in the following language in a letter to the corporation:

" * * * In order no inference may arise from my retention of the office of President of the Amdyco Corporation that I acquiesce to the action of said corporation in selling its business and thereby rendering it impossible for it to carry out the provisions of its contract with me dated June 7, 1923, which is still in force and with the terms of which I am ready to comply. My resignation as President is, therefore, not to be understood as terminating my employment by the Company pursuant to the terms of such contract of June 7, 1923, as amended, and I request payment to me of all commissions now due me thereunder."

On July 29, 1926, he was dismissed as sales manager, but was notified that he was required under the terms of his agreement of June 7, 1923, to continue for six months to render the services specified in that agreement. He was paid five months' salary but no commissions after his dismissal.

During Urquhart's period of employment by the plaintiff and its predecessor, several developments in the stabilizer and in the foam-forming compounds were made as a result of experiments and suggestions by him. It seems that the first radical change was in the production of the stabilizer in dry instead of liquid form, and later various methods were adopted, at his suggestion, by which the component foam-producing materials and the stabilizer were introduced into the mechanism connected with the hose for conveying the water in its foam stage to the place of the fire. There appears to have been considerable development also in ideas and methods pertaining to the character of mechanism to be used in introducing the foam-forming materials into the hose line. The apparatus which was most successfully used was in the form of a cement gun, the original function of which was to introduce cement into a hose line for spraying cement with the water through the hose.

During the connection of Urquhart with the Amdyco Corporation and the American Dyewood Company, he assisted and made suggestions in the development of foam stabilizers, compositions for the production of fire-extinguishing foam, and methods and apparatus for producing fire-extinguishing foam and, in some instances, joined with other employees in applications for patents. The applications and patents which were assigned to the corporation were Ewer patents, No. 1,527,509 and No. 1,562,878, for improvements in foam stabilizers; Ewer application, No. 689,568, for improvements in compositions for the production of fire-extinguishing foam; Palmer patent, No. 1,591,401, for a method and apparatus for

946

producing fire-extinguishing foam, issued July 6, 1926; Palmer application, No. 61,-004, for improvements in method and apparatus for producing fire-extinguishing foam; Ewer and Urquhart application, No. 700,771, for fire-extinguishing apparatus; Ewer, Palmer, and Urquhart application, No. 9067, for generation of fire-extinguishing foam, filed February 15, 1925. Urquhart also filed applications No. 63,595 for fire extinguisher, and No. 64,733 for method and apparatus for producing fire-extinguishing foam. All of the above-mentioned patents and applications for patents were assigned to the plaintiff or its predecessor.

Urquhart, while still employed by the plaintiff, and without its knowledge, on November 17, 1925, filed application No. 69,559 for letters patent for a method and apparatus for extinguishing fires which, it is charged by the plaintiff, is for an improvement in the method and apparatus of letters patent No. 1,591,401 issued to Palmer and assigned to the plaintiff. It is charged that the latter application by Urquhart was in violation of the fiduciary relations between him and the plaintiff, and was filed with intention to defraud the plaintiff; that Urquhart is estopped by virtue of his position as president of the Amdyco Corporation to assert any individual ownership of, or personal interest in, application No. 69,559, or the invention described therein; that his title is that of trustee, and that the plaintiff is the equitable owner of the invention, application, and entire beneficial interest therein.

After the termination of Urquhart's relations with the Amdyco Corporation, he, together with his brother, G. Gordon Urquhart, and Henry H. Lippincott, with others, organized a corporation named American Fomon Company, and transferred application No. 69,559 to the Fomon Company. It is asserted by the plaintiff that the formation of this company occurred while Urquhart was an employee of the plaintiff, and was a result of a conspiracy to appropriate and prosecute application No. 69,559, and to secure therein claims for the inventions of Palmer patent, No. 1,591,401, for the said Fomon Company; and that the inventions and improvements described therein having been made and devised while Urquhart was employed in a fiduciary relation with the plaintiff or its predecessor, and while, it is claimed, he was charged with the duty of making such inventions and improvements and with transferring his interest therein to the plaintiff, the inventions and improvements and applications and letters patent are

and ought to be the sole and exclusive property of the plaintiff.

On November 4, 1927, Urquhart inserted in his application a claim from an application for a reissue of the above-named Palmer patent. The application for the reissue had been filed on November 22, 1926. This was while Urquhart was still nominally in the employ of the Amdyco Corporation but after it had carried out the arrangement with the Foamite-Childs Corporation, under which the latter company obtained an exclusive license to manufacture and sell the products covered by patents and applications of the Amdyco Corporation. An interference was declared by the Patent Office, in which the issue is still pending.

It is claimed by the plaintiff that, if the issue is decided in favor of Urquhart and the American Fomon Company, his assignee, and a patent issued thereon for the invention, the Amdyco Corporation and its licensee, the Foamite-Childs Corporation, would be forced out of business.

The plaintiff bases its case upon facts which it claims are proved herein, that (1) Urquhart, as an employee of the American Dyewood Company and as president of the Amdyco Corporation, undertook the task of developing inventions, and specifically the task of providing a method and apparatus to produce fire-extinguishing foam; (2) Urquhart then being the executive officer and in control of the fire-extinguishing business of the company secured the advice and co-operation of Ewer and Palmer, employees of the company, and, with their assistance, and at the expense of the company, conducted an investigation and participated in experiments in the plant of the company at Chester, Pa., which resulted in the development of the Amdyco generator and other inventions; (3) Urquhart well knowing his duty and obligations to his employer, and knowing that the plaintiff expected him to fulfill that obligation, pretended to do so by assigning inventions of lesser importance to the plaintiff, but, while president and a director of the plaintiff, and in full control thereof, secretly filed an application for a patent for an improvement on the Amdyco generator and withheld it from the plaintiff; (4) being then the president of the plaintiff, Urquhart disclosed confidential information concerning the patent applications to his brother, G. Gordon Urquhart, and, while still an employee of the plaintiff, conspired with G. Gordon Urquhart and Henry H. Lippincott to defraud the plaintiff, and the said G. Gor-

don Urquhart and Henry H. Lippincott thereupon organized the American Fomon Company and took title to Urquhart's application with full knowledge of Urquhart's relation to the plaintiff; (5) upon the facts as alleged and proved, the Amdyco Corporation is the equitable owner of the Urquhart invention and the applications for patent therefor in all countries.

It is further stated in the plaintiff's brief:

"The issues here are concerned only with the apparatus of application No. 69,559 filed by R. M. Urquhart while an officer and employee of the Amdyco Corporation.

"The question of whether the generator sold by the American Fomon Company would infringe any patent which might issue on Urquhart's application is not raised in the pleadings and is not before the Court. Nor do we seek an adjudication of that question in this case. The relief prayed for in the bill is that Urquhart's applications in the United States and foreign countries and the resulting patents for inventions made by Urquhart as the result of his activities in the American Dyewood Company and the Amdyco Corporation be assigned to the latter company and that the American Fomon Company be enjoined from making and selling the generator of the Urquhart application. If the generator put out by the corporate defendant is *not* the generator of the R. M. Urquhart application, an injunction as prayed for in the complaint will not interfere with the activities of that company. The question of infringement can be raised in an appropriate action when a patent has issued."

The testimony shows that, after his employment as sales manager by the Dyewood Company, and the subsequent formation of Amdyco Corporation and the assignment of his contract of employment to the latter, Urquhart exerted every effort with energy and enthusiasm to promote the sales business of his employer, and that the Amdyco business was built up and extended through improvements made at his suggestion and under his direction, originally, and for a large part of the time of his employment, in the perfection of the compositions manufactured and sold by the plaintiff as foam generators and foam stabilizers, and that, in consequence of suggestions made by him and in accordance with his ideas and advice, the corporation made experiments and tests in the construction of apparatus for use with the foam generator and foam stabilizer for projecting the stream of foam in its use.

Now the plaintiff, in its contentions as to the duty of Urquhart to his employer, entirely overlooks the fact that he was working in his own interest as well as that of his employer, as he had a right to do under his contract of employment. His individual profits and compensation were derived, aside from his salary, from his earning the commissions provided for in the contract. He received no additional compensation for being the president of the Amdyco Corporation, but he did receive substantial compensation as commissions upon all sales of the product. During the time of his employment, and up to the time his contract was ended by the action of the plaintiff in turning over its entire sales business to the Foamite-Childs Corporation, the company had not engaged in the manufacture of apparatus, nor was it engaged in the sale of apparatus, and these facts were announced to its customers and to the trade from time to time. The only apparatus in which the company was directly interested was the cement gun manufactured by the Cement Gun Company and, although experiments were made from time to time with it, it was not produced or sold by the plaintiff. The Cement Gun Company, however, had an application pending for a patent for introducing foam powder into a water stream through the cement gun.

The issues in the case being limited as they are through the stand taken by the plaintiff that whatever work done or knowledge acquired by Urquhart while in its employ, leading to patents and specifically to the application No. 69,559, belong, in equity, to the plaintiff, the facts in relation to the development of that application must be considered. I find those facts to be as follows:

Early in 1924 Urquhart's brother, G. Gordon Urquhart, was in the employ of the I. P. Thomas Sons Company, which was collaborating with the United States agricultural experiment station at Riverton, N. J., for the extermination of the Japanese beetle, and about that time G. Gordon Urquhart devised an injector for introducing beetle-killing chemicals into a hose stream so that the chemicals would be mixed in different proportions with water and spread upon the beetle-infested turf. This device was capable of being used with powdered chemicals, and was put into practical use with the approval of the government entomologist in the summer of 1924. G. Gordon Urquhart did not

propose to patent the machine at that time and so informed the government entomologist. In order to introduce the grub-exterminating chemicals separately into the hose stream, G. Gordon Urquhart had a copper funnel or hopper made with a partition for separating the chemicals, and had it attached to a chemical injector device used by the I. P. Thomas Company. He and the defendant Urquhart experimented with it on the lawn of G. Gordon Urquhart at Cynwyd, Pa., in feeding foam chemicals into a hose stream. Those experiments were successful in showing a means for introducing dry powders separately before introduction to the stream of water, so that there was no mixing of the powders until they reached the stream. The device was described to Mr. Talbot, the representative of the Cement Gun Company, who testified that it was a small machine which worked on the principle of an injector, the powder being put into the tank and the water introduced below, "it pulled the powder in." This all occurred prior to the formation of the Amdyco Corporation or to Urquhart becoming president thereof. At that time, the American Dyewood Company was informing the trade that "The American Dyewood Company is not engaged in the manufacture or sale of equipment for foam installations and does not recommend the installation of any particular apparatus and equipment." The testimony shows that at that time the American Dyewood Company was interested only in the adaptation of the Cement Gun Company's gun as a means of demonstrating its product, and had no interest whatever in apparatus for manufacture or sale in its business.

Urquhart's application, No. 69,559, so far as the purposes of this case are concerned, may be said to be based upon a development of the device suggested by his brother's machine experimented with at Cynwyd in 1924.

With the novelty or other elements of invention involved in the application or interference this court has no concern, and the only question here is whether the terms of Urquhart's employment require an assignment to the plaintiff of his rights in whatever invention there may be in the application for that method and apparatus.

The position taken on behalf of the plaintiff is that the facts in the instant case are squarely within the rulings of Mr. Justice Brewer in Solomons v. United States, 137 U. S. 342, 11 S. Ct. 88, 89, 34 L. Ed. 667, and they cite the following language of the court in that case:

"The government has no more power to appropriate a man's property invested in a patent than it has to take his property invested in real estate; nor does the mere fact that an inventor is, at the time of his invention, in the employ of the government transfer to it any title to or interest therein. An employee, performing all the duties assigned to him in his department of service, may exercise his inventive faculties in any direction he chooses, with the assurance that whatever invention he may thus conceive and perfect is his individual property. There is no difference between the government and any other employer in this respect. But this general rule is subject to these limitations: If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer."

They also rely on the following language of the Supreme Court in Gill v. United States, 160 U. S. 426, 16 S. Ct. 322, 326, 40 L. Ed. 480, as follows:

"There is no doubt whatever of the proposition laid down in Solomons' Case, that the mere fact that a person is in the employ of the government does not preclude him from making improvements in the machines with which he is connected, and obtaining patents therefor, as his individual property; and that in such case the government would have no more right to seize upon and appropriate such property than any other proprietor would have. On the other hand, it is equally clear that, if the patentee be employed to invent or devise such improvements, his patents obtained therefor belong to his employer, since in making such improvements he is merely doing what he was hired to do. Indeed, the Solomons Case might have been decided wholly upon that ground, irrespective of the question of estoppel, since the finding was that Clark had been assigned the duty of devising a stamp, and it was understood by everybody that the scheme would proceed upon the assumption that the best stamp which he could devise would be adopted, and made a part of the revised scheme. In these consultations it was understood that he was acting in his official capacity as chief of the bureau of engraving and printing, but

it was not understood or intimated that the stamp he was to devise would be patented, or become his personal property. In fact, he was employed and paid to do the very thing which he did, viz. to devise an improved stamp; and, having been employed for that purpose, the fruits of his inventive skill belonged as much to his employer as would the fruits of his mechanical skill."

They also cite McAleer v. United States, 150 U. S. 424, 14 S. Ct. 160, 37 L. Ed. 1130, and Houghton v. United States (C. C. A.) 23 F.(2d) 386.

The Circuit Court of Appeals of this circuit in Pressed Steel Car Co. v. Hansen, 137 F. 403, 406, 2 L. R. A. (N. S.) 1172, considered the application of the decision in the Solomons Case. Judge Gray, in his opinion, observed that the Hansen Case, as stated by the court below, involved three inquiries: First, whether any express contract by Hansen to transfer the patent to the complainants was proved to have been made; second, whether the facts proven were such as to warrant a presumption that a contract existed; and, third, whether a contract to transfer is to be implied in law from the relations between the parties.

In this case, as in the Hansen Case, there was no express contract by Urquhart to transfer patents to the plaintiff. The contract is in writing. All that Urquhart was required to do was to sell the product known as "Fyrout" subject to the directions of the company, "to devote his entire time to selling the product and traveling in such territory as the Company may consider as advantageously to be canvassed." There was, therefore, nothing in the contract between the parties having anything to do with making inventions or assigning the interest in such inventions to the plaintiff.

The second inquiry is whether the facts proven are such as to warrant a presumption that a contract exists. Urquhart's activity and interest in the development of the business of the company, and in assisting in procuring patents which might be advantageous to the company, does not afford ground for presuming that a contract existed to do more than promote as far as possible the sales of the company in which he had an interest through earning his commissions. Whatever increased the sales of the company redounded to Urquhart's benefit as well as to that of the company, for it increased his earnings.

And the fact that he had assisted in applications for patents in other instances for the benefit of the company does not warrant such presumption.

The same fact was present in the Hansen Case where Hansen was engaged as engineer and had charge of all of the departments, so far as the mechanical end of the business was concerned, and it was within his duties to improve or assist in improving the manufactured products of the company, and in devising and designing cars or the parts there. It was held by Judge Gray that the fact that Hansen had assigned six patents to the plaintiff did not afford a presumption that he was under any contract to assign them, or to assign the other patents which he later obtained, and that no presumption of such contract could be based on the fact that Hansen was chief engineer of the company and had, as such, charge of developments in devising and designing cars. Judge Gray said:

"The bill being for the specific performance of a contract, such contract must be clearly and unequivocally proved, as stated. As proved, its terms as to subject-matter, consideration and all other essentials, must be explicit and unambiguous."

He concluded that, under the evidence, there was no such proof.

The facts in the case at bar are, therefore, by no means on all fours with the facts in the Solomons Case or in the Gill Case. In the first place, there was no express contract by Urquhart to invent or to assist in inventing for the plaintiff, and it is not denied by the plaintiff here that the written contract, under which Urquhart was employed, does not include any duty such as Clark had put upon him by his employment in the Solomons Case. There was assigned to Clark the duty of devising a stamp, and it was held that, having been employed for that purpose and having devised the stamp, the fruits of his inventive skill belonged as much to his employer as the fruits of his mechanical skill. It is contended on the part of the plaintiff here that, in view of what Urquhart actually did while in the employ of the plaintiff, and in view of the relations of the parties, anything he might invent or which might be the product of his brain in relation to fire-extinguishing foam or apparatus for projecting fire-extinguishing foam, was, in equity, the property of his employer.

In the case of Pressed Steel Car Co. v. Hansen, Judge Gray drew the distinction between the Solomons Case and a case where it was endeavored, through proving the course of conduct between the parties and their re-

lations, to have the court draw the conclusion that there was an obligation on the part of the patentee to assign his invention to his employer.

In the case of Ingle v. Landis Tool Co. (C. C. A.) 272 F. 464, Judge Buffington, in rendering the opinion of the court, said:

"This case concerns the relative rights in a patent of an employer and an employee, where the latter makes an invention during his term of employment. This vexed question was the subject of litigation in this circuit, and its principles were discussed and determined by this court in Pressed Steel Car Co. v. Hansen, 137 F. 403, 71 C. C. A. 207, 2 L. R. A. (N. S.) 1172, where, in affirming the decision of the lower court, reported at 128 F. 444, this court held that, in the absence of an express contract or agreement to invent, the relation of employer and employee did not vest the employer with the entire property right of an invention of the employee, and to the patent monopoly thereof, or to anything more than a shop right to use such invention."

I find, therefore, that what Urquhart did in assisting in making inventions for stabilizers and foam-producing mixtures was not done in carrying out any duty which he owed to his employer; for he would have been entitled to his salary and commissions on sales, which was the sole consideration for his contract, whether or not he had made any inventions. It was, however, to his personal interest to increase the sales business of his employer, for, by so doing, he enriched himself in commissions. Whether or not the plaintiff would be entitled to a shopright in whatever invention is shown in Urquhart's application need not be considered here, for the plaintiff is asserting its right to one thing and that only, and that is an assignment of Urquhart's application.

It is suggested on the part of the plaintiff that Urquhart covertly learned the secrets of the plaintiff's business and concealed his invention, covered by the patent application involved in this suit, with the apparent deliberate intention of forming a company to compete with the plaintiff's business, all of such alleged underhand intentions being formed, and, as far as possible, put into effect while he was still in the employ of the plaintiff. A slur of that sort does not come with very good grace from an employer who deliberately and covertly, while its contract with Urquhart was still in force, entered into a contract with the Foamite-Childs Corporation, under which all the future profits

from sales in the business, which Urquhart had loyally and faithfully built up, were turned over to its old rival, and Urquhart was left with nothing to sell.

Finding no equity in the plaintiff's case, a decree may be entered dismissing the bill at the plaintiff's costs.