## BOWERS et al. v. WOODMAN.

### No. 3450.

District Court, D. of Massachusetts.

June 10, 1932.

Pierpont L. Stackpole and Warner, Stackpole, Bradlee & Cabot, all of Boston, Mass., for plaintiffs.

Herbert Parker, of Boston, Mass., for defendant.

BREWSTER, District Judge.

By this bill in equity the complainants, as receivers of the Wickwire Spencer Steel Company, seek to compel the assignment by the respondent to the complainants of certain patents and applications for letters patent covering conveyor belts and improvements thereon.

### Statement of Facts.

(1) The Wickwire Spencer Steel Company is a corporation, and until 1927 was engaged in the manufacture of steel products. It operated seven plants situated in this and other states, one of which is located in Clinton, Mass. On October 21, 1927, the complainants were appointed receivers of the corporation, and they have since then continued its business.

(2) The Clinton plant was originally established for the fabrication or weaving of wire. Other departments were added, and in the course of time one of the products of this plant was metal conveyors, or belts, used to carry articles from place to place. It is to such conveyors that the patents and applications for letters patent involved in this suit relate.

(3) The respondent, Woodman, had never received any technical education. Equipped with experience in other manufacturing plants, he came, in 1924, to the Wickwire Spencer Steel Company, and was first assigned the duties of investigating the conditions of the several plants and reporting his results. His work at first would best be described as that of a cost accountant, which involved studying the operations of the plant with a view of ascertaining the cost of production and effecting economics in such production. In May, 1926, he was appointed assistant superintendent at Clinton, and on February 17, 1927, he was promoted and made superintendent of the Clinton plant. His duties then were those usually devolving upon an executive in a manufacturing plant, namely, keeping up production, checking economies, and maintaining discipline. While assistant superintendent, he was instrumental

in organizing a department which later came to be known as the "Engineering Department," in which men with technical training were employed. At the outset this department was principally concerned with cost accounting, but in the course of time it gave attention more and more to research, investigation, and experimentation, especially concerning new products for which there was thought to be a demand from the trade. This department was under the immediate superintendency of a Mr. King, but the respondent, first as assistant superintendent and then as superintendent, had general supervision over the work of the department. The superior officer directly over the respondent was Mr. Macklin, who had been one of the vice presidents of the steel company. After the receivership, he was appointed by the receivers general manager, with the duties of executive vice president. Mr. Macklin had direct charge of the Clinton plant until February, 1929, after which a district manager exercised supervision.

(4) About 1924 the steel company began to manufacture at Clinton a conveyor known as a "spiral belt." Prior to October, 1928, as a result of research and experiment made in the engineering department, there was developed a so-called "high temperature belt" which was constructed of material that would permit the belt to be used as a conveyor through furnaces and other places where it would be subjected to extremely high degrees of temperature. This high temperature belt was exhibited in Philadelphia, Pa., at the October, 1928, meeting of the American Society for Steel Treating, and in a report on this exhibition addressed to Mr. Macklin and to the respondent, it was brought to the attention of the respondent that this belt had "stirred up a certain amount of competition," and that the strongest competition might come from the Link Belt Company. I quote the following from this report: "It must be borne in mind too, that a belt made of flat links would lend itself very readily to this work and that it would be also a simple matter to equip a flat link belt with retaining sides. I have discussed this matter with Mr. Woodman and advised that the flat belt be studied, and any special features that can be discovered, which would render it available for this use, be covered by patents."

(5) The engineering department and the respondent were at that time much interested in perfecting, and overcoming objections to, the spiral belts both for high and low temperatures, and nothing was done toward bringing out a flat link belt until the summer of 1929, when the respondent during his vacation turned his attention to the problem and reduced to concrete form his ideas of a flat link belt. The drawing for this belt was prepared by an employee of the complainants out of working hours, and paid for by the respondent. The model of the belt, however, was made at the Clinton plant by employees of the complainants during working hours, and the machinery, tools, and materials were those of the complainants, and experiments and tests were made by the respondent's fellow employees, and apparently suggestions of those in the engineering department were adopted by the respondent. From this time until June, 1931, when the respondent severed his connection with the receivers, other flat link belts were developed by him at the Clinton plant in much the same way. A belt, made of a series of flat plates, which was known as a "plate belt," was also developed. The important variations in these different types of belt are found in the hinges used as a means for holding together the links or the flat plates. These several different types were protected by patents issued to the respondent, or by applications for letters patent filed by him, upon which patents have not yet issued, and it is these patents and applications for letters patent that the complainants now claim should be assigned to them.

(6) It was not until 1928 that the respondent began to reveal his inventive genius, but from that time until he severed his connection with the work he gave an ever-increasing amount of attention to the experiments and research carried on under his supervision in the engineering department, and, as the results crystallized in new products, they were protected by applications for letters patent, many of which were filed in the name of the respondent, Woodman.

In February, 1928, the respondent was directed by the official in direct charge of patents to take his patent matters to Messrs. Southgate, Fay & Hawley, patent attorneys, in Worcester. This the respondent proceeded to do, and between that time and January, 1929, so many matters were taken to the patent attorneys that Mr. Macklin deemed it necessary to call a halt by advising the respondent that thereafter no applications for letters patent should be filed at the company's expense without first getting authority from the official in charge of legal matters. The respondent assented to this restriction. After he had de-

veloped his first flat link belt, he took up directly with his attorneys the matter of securing a patent thereon. In September, 1929, he showed Mr. Macklin a model of the belt, and he told him then that he was taking out the patent in his own name and at his own expense. Mr. Macklin's only reply was, "You should not use your own money for that purpose." Woodman supposed that Mr. Macklin then understood that he (Woodman) would not assign the application. Up to this time the respondent had filed eleven applications, all of which he has assigned to the complainants. The respondent gave as a reason for departing from the practice that had theretofore obtained of taking out patents at the expense of the company that this invention involved an entirely new principle in metal conveyors and marked a distinct advance in the art, and that the plant, being operated under receivership, might at any time be sold and pass into other hands. The next conversation, regarding the patents in controversy, took place in March, 1931, when Mr. Macklin, learning that an application for one of the patents had not been assigned, pointed out to the respondent that he was following the wrong policy, and suggested that he take further time to think the matter over, and later, in June, when a request for assignment was renewed, the respondent still persisted in refusing and resigned on June 13, 1931.

(7) Subsequently, four patents were issued, two covering the flat link belt and two covering the plate belt. These were: No. 1,829,773, issued November 3, 1931, on application filed May 15, 1930; No. 1,836,422, issued December 15, 1931, on application filed December 13, 1930; No. 1,839,071, issued November 29, 1931, on application filed November 15, 1930; No. 1,839,072, issued December 29, 1931, on application filed May 19, 1931.

In addition to these letters patent, applications for other letters patent are pending covering inventions or improvements in link belts and flat plate belts, and these include the so-called "Delta Plate Belt," specifically referred to in complainants' bill of complaint.

No assignment by the respondent of his patent rights was made pursuant to any express agreement, nor was it an express condition of the respondent's employment that he should assign all his interest in inventions made while in the employ of the complainants.

(8) Subsequent to January 1, 1928, there was only one increase in respondent's salary, and there is no evidence warranting the inference that this increase was in payment or recognition of the respondent's inventive genius.

(9) Woodman's duties as superintendent included the exercise of due diligence and skill in promoting the success of the business carried on by the complainants. This involved his attention to, and his active interest in, improving and adding to the products of the plant over which he had superintendency. It does not appear, however, that at any time Woodman expressly agreed to devote his skill or energy in the invention of new products.

(10) The complainants are manufacturing and selling conveyors similar to those covered by the patents, with possibly some modifications in the means for joining the links or plates, and this without any suggestion from the respondent that the complainants are liable for infringement.

### Conclusions of Law.

The complainants are here invoking the powers of this court, not only to secure the enjoyment of rights under them, but to establish full ownership in letters patent of the United States, issued to the respondent, and also in pending applications for other letters patent, which letters patent and applications cover inventions conceived and developed by the respondent while in the employ of the complainants. At the outset we are met with the general proposition, firmly established, that "a manufacturing corporation which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of express agreement to that effect." Dalzell v. Dueber Watch-Case Mfg. Co., 149 U. S. 315, 320, 13 S. Ct. 886, 888, 37 L. Ed. 749. See, also, Hapgood v. Hewitt, 119 U. S. 226, 7 S. Ct. 193, 30 L. Ed. 369; Ingle v. Landis Tool Co. (C. C. A.) 272 F. 464.

This general rule has been applied in cases where the employee inventor was charged with the duties of supervising the work of his employer, Pressed Steel Car Company v. Hansen (C. C. A.) 137 F. 403, 2 L. R. A. (N. S.) 1172, certiorari denied 199 U. S. 608, 26 S. Ct. 749, 50 L. Ed. 331; Johnson Furnace & Engineering Co. v. Western Furnace Co. (C. C. A.) 178 F. 819, 823; Hapgood v. Hewitt, supra; to cases where, as inci-

dental to his general duties, the employee was required to devote his skill and energy to improving or perfecting the machinery, processes or products of his employer, Hapgood v. Hewitt, supra; Dalzell v. Dueber Watch-Case Mfg. Co., supra; Amdyco Corporation v. Urquhart (D. C.) 39 F.(2d) 943; and to cases where the device invented was developed by the employee during his employment, with the aid of his fellow employees, and with the use of his employer's machinery, tools, and materials, Hapgood v. Hewitt, supra; Pressed Steel Car Company v. Hansen, supra; Dalzell v. Dueber Watch-Case Mfg. Co., supra; Manton-Gaulin Mfg. Co., Inc., v. Colony, 255 Mass. 194, 151 N. E. 71, 44 A. L. R. 589.

The relationship of employer and employee, the nature of the employment and the development of the invention during hours of employment, and at the employer's expense, are circumstances which have universally been held sufficient to confer upon the employer an irrevocable license to use the invention without payment of any royalty, especially when the employee has tacitly and expressly consented to such use. Solomons v. United States, 137 U. S. 342, 11 S. Ct. 88, 89, 34 L. Ed. 667; McAleer, Adm'x v. United States, 150 U. S, 424, 14 S. Ct. 160, 37 L. Ed. 1130; Lane & B. Co. v. Locke, 150 U. S. 193, 14 S. Ct. 78, 37 L. Ed. 1049; Keyes v. Eureka Consolidated Mining Co., 158 U. S. 150, 15 S. Ct. 772, 39 L. Ed. 929; Gill v. United States, 160 U. S. 426, 16 S. Ct. 322, 324, 40 L. Ed. 480; Houghton v. United States (C. C. A.) 23 F. (2d) 386.

The first question presented is whether the respondent entered into any express agreement to assign his inventions to the complainants. It is conceded that there was no written or oral agreement, but it is argued that the facts established a contract arising by necessary implication from the words and acts of the parties. While the fact that respondent had assigned other patents, or inventions, is some evidence of the existence of an agreement to assign all inventions, it is not conclusive. Pressed Steel Car Co. v. Hansen, supra; Lambert Tire & Rubber Co. v. Brubaker Tire Co. (C. C. A.) 5 F.(2d) 414; Amdyco Corporation v. Urquhart, supra.

Whatever effect may be given the course of conduct pursued by the respondent relative to the assignment of patents prior to September, 1929, it is obvious that subsequent to his conversation with the general manager he did not intend to assign the patents or applications involved in this suit. On the contrary, the evidence negatives such an intention. If the complainants understood that the patents would be assigned, this understanding entirely lacked mutuality. The fact that the respondent did not follow the course laid down by his superiors and present his applications for approval before submitting them to the patent attorneys, his statement to the general manager that he was taking out the patents in his own name and at his own expense, and the fact that he paid all expenses after being advised that he need not do so, all are inconsistent with the existence of any intention on the part of the respondent to part with the absolute title to the invention. If relief is sought on the ground that the complainants are entitled to the specific performance of a contract, it is well settled that such contracts must be definitely and distinctly established with no uncertainty respecting the terms of the agreement, or a meeting of the minds of the parties upon these terms. Dalzell v. Dueber Watch-Case Mfg. Co. supra; National Wire Bound Box Co. et al. v. Healy (C. C. A.) 189 F. 49; Pressed Steel Car Co. v. Hansen, supra.

In both Hapgood v. Hewitt, supra, and Dalzell v. Dueber Watch-Case Mfg. Co., supra, no contract was found to exist on facts much more favorable to the employer than are those in the case at bar. In the Hewitt Case, Hewitt was engaged because of his experience in manufacturing plows and his demonstrated ability to perfect and improve the manufactured article; and in the latter case the employee's wages were increased upon a confident belief, expressed by the employee, that the improvements he would make during the coming year would justify the increase.

In the case at bar, no such inducements were at any time held out by the respondent to induce either the employment or its continuance or any increase of salary. It cannot be said, therefore, that the evidence establishes any agreement which would bring the case within the general rule above stated.

The complainants nevertheless press upon the court the argument that, even in the absence of an express agreement to assign the patents, they became the property of the complainants (a) by reason of the nature of the employment and the ends sought for in employing the respondent, and (b) that the respondent was assigned specifically the duty of developing the belts, which were the subject-matter of the patents and applications for letters patent in suit. In support of their contention, the complainants cite Solo-

mons v. United States, supra; Gill v. United States, supra; Standard Parts Company v. Peck, 264 U. S. 52, 44 S. Ct. 239, 241, 68 L. Ed. 560, 32 A. L. R. 1033; Houghton v. United States, supra; Wireless Specialty Apparatus Co. v. Mica Condenser Co., Ltd., 239 Mass. 158, 131 N. E. 307, 16 A. L. R. 1170.

The Solomons Case and the Gill Case were both proceedings brought by the employee, either to enjoin, or to exact compensation for, the use of the invention, but in the opinions there is language which it is believed lends support to the proposition that, in equity, the employer may deprive the inventor of all interest in a patent granted to him. The Solomons Case recognizes the general rule; the court stating that: "An employee, performing all the duties assigned to him in his department of service, may exercise his inventive faculties in any direction he chooses, with the assurance that whatever invention he may thus conceive and perfect is his individual property." The court then goes on to say: "But this general rule is subject to these limitations: If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer."

It is significant that the learned judge, early in his opinion, acknowledged the ownership of the patent to be in the assignee of the patentee, and, when he is dealing with the exception to the general rule, he says only that the employee cannot, under the circumstances recited, *plead title against his employer*. (Italics mine.) The court was dealing only with the rights of the employer to use the invention, and I am not persuaded that the court intended to modify the doctrine laid down in the Hewitt Case. The doctrine has since been reaffirmed in the Dalzell Case. In the case of Gill v. United States, supra, also dealing with the rights of the employer to use the employee's invention, the court intimates that the principle invoked was "really an application or outgrowth of the law of estoppel in pais, by which a person looking on and assenting to that which he has power to prevent is held to be precluded ever afterwards from maintaining an action for damages." It is true that, in the course of the opinion, it is stated that, if the patentee be employed to invent, his patents belong to his

employer. The court, speaking through Mr. Justice Brown, add: "So, if the inventions of a patentee be made in the course of his employment, and he knowingly assents to the use of such inventions by his employer, he cannot claim compensation therefor, especially if his experiments have been conducted or his machines have been made at the expense of such employer."

Thus neither the Solomons Case nor the Gill Case can be accepted as controlling authorities on a question involving the absolute and entire ownership of the monopoly granted by the patent.

In Standard Parts Company v. Peck, supra, the employee was ordered to assign patents to his employer. In that case the Supreme Court extended the exception to the general rule so far as to cover cases where the employee was employed to invent, or devise, the specific thing for which a patent was issued to him. From the facts of that case, it appears that Peck was originally employed because of his inventive genius, and he expressly agreed "to devote his time to the development of a process and machinery for the production of the front spring now used on the product of the Ford Motor Company." For this special service he was to receive a salary and bonus. It was held that the results of his skill and genius belonged wholly to the employer. The decision was apparently based upon the proposition that the invention of a specific thing can be made the subject of a bargain and pass in execution of it; the court holding that such was the object and effect of Peck's contract.

I regard this case as standing at the outpost of the field in which equity would be justified in entirely depriving an inventor of all the fruits of his labor, secured to him by a grant from the United States government. To carry beyond this point the exception to the general rule would, in my opinion, disregard the cases of Hapgood v. Hewitt, supra, and Dalzell v. Dueber Watch-Case Mfg. Co., supra, which I am not prepared to do until they have been overruled.

The facts of the case at bar do not come within the Peck Cast. The respondent was not originally employed because of his technical skill. When he entered the employ of the Wickwire Spencer Steel Company, it was not known that he possessed any aptitude as an inventor. He was promoted to the position of superintendent, and he assumed the duties of generally supervising the operations of a manufacturing plant. Quite

naturally, it was his duty, among others, to see that the products of the plant kept pace with the demands of the trade; that research and experiments were conducted with a view to discovering and developing improvements upon the product. If, in the performance of these duties, he developed a talent for working out novel and useful devices, it does not follow that he was employed to invent any specific device. If he had never invented anything, he could not have been charged with a failure in the performance of his duties as superintendent, or with a failure to fully earn his compensation. Not only is there no contract to assign his inventions, but there is, in this case, no contract to invent. In the absence of either of such contracts, the great weight of authority is to the effect that the employer has an irrevocable license to use the invention, but has no rights to compel a conveyance of the patent covering the invention. American Circular Loom Co. v. Wilson, 198 Mass. 182, 84 N. E. 133, 126 Am. St. Rep. 409; Pressed Steel Car Co. v. Hansen, supra; Amdyco Corporation v. Urquhart, supra; Lambert Tire & Rubber Co. v. Brubaker Tire Co., supra; National Wire Bound Box Co. et al. v. Healy, supra; Ingle v. Landis Tool Co., supra.

The complainants stress the interdepartmental communication reporting the Philadelphia exhibition, which brought to the attention of the respondent the probable need of link belts, but the evidence falls short of establishing any definite instruction from his superior officers to the respondent requiring him to devote his time and attention to the invention of any specific device.

It is undoubtedly true that other employees of the complainants pointed out the desirability of supplying the trade with a conveyor belt different from anything that had theretofore been manufactured by the complainants, and that the suggestion stimulated the respondent in his efforts to evolve a belt which would meet the demands of the trade. I am unable to find in this case that the facts warrant the conclusion that the respondent was under any definite obligation to the complainants to conceive or develop his belt, or that it can be said that such inventions were the "subject of a bargain and pass in execution of it."

The first link belt developed at the Clinton plant was Woodman's conception, and it must be assumed that he was the first inventor of all the patented devices. Whether others are the real inventors of any of the link, or plate, belts for which applications were filed by Woodman, is a question that must be determined in other proceedings.

My consideration of the cases leads me to the opinion that the doctrine of Hapgood v. Hewitt, supra, and Dalzell v. Dueber Watch-Case Mfg. Co., supra, has not been modified by subsequent decisions. On the contrary, the doctrine seems to have been adopted in the majority of cases arising in the lower courts. I hold the doctrine to be applicable to the case at bar, and that therefore the relief prayed for in the instant case must be denied.

The bill may be dismissed.