Booth, Chief Justice,
delivered the opinion of the court:
The plaintiff is now in the Corps of Engineers, United States Army. He was prior to May, 1917, an employee of the defendant on the Mississippi River Commission, having held this position for a period of seven years. Under the provisions of the act of June 25, 1910, 36 Stat. 851, as amended by the act of July 1, 1918, 40 Stat. 705, conferring jurisdiction upon this court in patent cases, the plaintiff, a patentee, is precluded from bringing suit against the defendant for an alleged infringement of his patent rights, because of his service in the Government at the time he makes his claim. A proviso to the foregoing acts so states.
The Congress enacted the special jurisdictional act, set out verbatim in finding 2. This act was approved by the President on December 17,1930, and the present suit for infringement was commenced January 16, 1932. The parties to the case agree that the special jurisdictional act confers jurisdiction upon the court to adjudicate the case irrespective of plaintiff’s service in the Government and the statute of limitations, but seriously disagree as to the scope and meaning of the act in other respects.
The special act contains a number of specific and mandatory provisions imposing upon the court a method of procedure in adjudicating the issues, and it is these provisions which originate an interposed defense vital to the determination of a governmental liability for any infringement of plaintiff’s letters patent.
The plaintiff takes the position that the express waiver of governmental service and the statute of limitations places the litigation in the same status as any other ordinary patent case, and that the additional express provisions of the act exacting consideration of governmental service, expenditure of Government funds in developing the inventions, etc., have exclusively to do with fixing the amount of compensation due in the event of a determined infringement of the patents.
Plaintiff’s letters patent 1173879, relating to a revetment structure, were issued February 29, 1916, and on this date the patentee was an employee of the Mississippi River Commission, serving as junior engineer and chief of a revet *73 ment party. On the same date letters patent 1173880 were issued to plaintiff relating to a molding frame for casting the revetment structure described in patent 1173879. Infringement of this patent is no longer claimed in this suit.
On June 5, 1917, the date when letters patent 1229152 for a launching apparatus were issued to plaintiff, he was a member of the Engineer Corps of the United States Army, having been commissioned as such about May, 1917. Knowledge by Congress of the facts just stated, and of additional ones to be stated, was undoubtedly the reason for inserting the provisions of the special jurisdictional act which it is essential to quote. They are as follows:
In determining whether or not said David McD. Shearer is entitled to compensation and the amount of compensation, if any, for the use of said inventions the court shall take into consideration, if and so far as the facts may warrant, the facts, if proved, that while said David McD. Shearer was engaged in perfecting the invention he was in the service of the United States as a junior engineer superintendent in charge of willow bank revetment construction under the Mississippi River Commission, and whether and, if at all, to what extent said inventions or any of them were discovered or developed during the working hours of his Government service, and to what extent his said inventions for protection of river channels and banks differ from the methods previously used, in material, method of laying, permanency, and value, and, whether if at all to what extent the expense of making experiments, trials, and tests for the purpose of perfecting said inventions was paid by the United States, and if any such expense was incurred by the United States, whether and, if at all, to what extent the United States received compensation for such expense.
We think claims (3) and (6) of patent 1173879 and claims 6, 8, and 9 of patent 1229152 are valid and read upon the revetment apparatuses used by the Government. This fact does not however determine the defendant’s liability as for an infringement of the same. The above quoted provisions of the special jurisdictional act considered in connection with the provisions of the entire act are of paramount importance in the ascertainment of governmental liability as claimed.
*74 The plaintiff was for about seven years employed, as previously observed, as junior engineer and chief of a revetment party by the Mississippi River Commission, a governmental agency. During this entire period the adopted method of the Commission in revetment work was to utilize what is termed fascine mattresses. Fascine mattresses were made up of willow brush obtained near the banks of the river. The willow brush was segregated into bundles about 8 feet long and 12 inches in diameter, compressed tightly and wired together at intervals.
When the 'willow mattress was completed it resembled a raft, and after being launched floated upon the surface of the river. To accomplish its submergence at a desired point in the river bed the willow float would be weighted down by placing thereon a stone ballast consisting of large sized pieces of stone capable of being carried by a single workman. The plaintiff was thoroughly familiar with the process of constructing, launching, and sinking fascine mattresses and their value when placed in retarding erosion of both the banks and beds of the stream. He had supervised about seventy installations of fascine mattresses.
During the course of his extended experience in revetment work the imperfections of fascine mattresses to accomplish all that was desired became apparent to him. Being an engineer of ability he observed that fascine mattresses were of comparatively short life, that the cables which held them together yielded to rust, and upon their disintegration were readily susceptible to misplacement, exacting numerous replacements, and this was especially true with respect to subaqueous revetment work.
November 25, 1913, Major Woodruff, plaintiff’s superior on the River Commission, addressed an order, the contents of which reached the plaintiff, calling attention to the “Failure of bank revetments” along the banks of the Mississippi River and directing the chiefs of all revetment parties to submit on or before April 1, 1914, their ideas as to the cause of said failure, and their suggestions as to essential changes in the methods of construction employed.
The plaintiff on or about February 12, 1914, responded to the above order and in his report entitled “Sketches *75 stowing Failures and Eecoinmended Eevetment Types” proposed the use of concrete as a substitute for riprap then used in upper bank protection. The record sustains an inference that at this time plaintiff was interested in the use of concrete in revetment structures.
We say this because plaintiff’s proposal, while it referred especially to upper bank protection, also contained a reference to subaqueous willow mat protection, noting its imperfections, and indicating that the willow mat was good “as long as it lasts”, and closing with an observation that in any event it was superior to ever-failing riprap.
In May, 1914, plaintiff was on leave of absence and at his home in Lufkin, Tesas. His interest in the use of concrete in revetment structure continued, and he communicated with the district office of the Third Mississippi Eiver District, and among other things asked for authority to investigate further the subject matter under consideration.
Major Slattery, plaintiff’s superior officer, willingly acceded to plaintiff’s request, commended him for his report,, and gave him plenary authority to study and report upon improved methods pertaining to the work in which they were engaged. On some indefinite date, but at least as early as October 6, 1914, plaintiff submitted to the District Engineer Officer of the proper district what is identified in the record as plaintiff’s exhibit 7.
This exhibit is important; it is made up of detail drawings accompanied by a meticulous and lengthy description disclosing the method of constructing concrete mats and mattresses, an apparatus for their molding, and a mechanism for their launching, together with a discussion as to their availability for subaqueous revetments instead of fascine mattresses.
The plaintiff testifies and now contends that he conceived the apparatuses disclosed in exhibit 7 and prepared the exhibit itself outside his regular working hours.
The defendant challenges the fact and insists in addition that what the plaintiff did was within his duties and in pursuance of the orders of his superior officer. On the date he forwarded exhibit 7 to the district office he was not upon an active duty status, being away on his vacation,. *76 and plaintiff is the» only witness testifying to the date when he conceived the drawings and apparatuses disclosed by exhibit 7. Courts are loath to accept the uncorroborated testimony of a plaintiff as to this point. We think, however, that exhibit 7 in this particular instance furnishes the corroboration. Eibel Process Co. v. Paper Co., 261 U. S. 45; Symington Co. v. National Castings Co., 250 U. S. 383.
The next important proceeding was inaugurated in April, 1915. Major Slattery notified the plaintiff of the Commission’s purpose to conduct a trial of the concrete revetment structure disclosed by him. To accomplish this act it was necessary to alter the mechanism used to launch fascine mattresses and plaintiff received express instructions to be present and supervise this work. Plaintiff was present and did personally supervise all that was done until June 28, 1915, on which date he was relieved of this assignment and transfex-red to other duties.
In July, 1915, a number of attempts were made to launch and place concrete revetments in accord with plaintiff’s disclosures. Concrete mats were cast axid formed into sections and some of them were successfully launched. This trial however demonstrated difficulties of a serious nature in the launching apparatus, so serious that upon one attempt the entire concrete mattress went overboard and was lost. The necessity for changes in the launching apparatus was apparent and imperative. The plaintiff was present during this demonstration and while he took no official part in it his expenses were paid for attending it. This is known as the Greenville test.
In August, 1915, plaintiff submitted to Major Slattery a blueprint disclosing his modified design intended to correct and overcome the impei’fections of the launching apparatus used at Greenville. Plaintiff some time prior to this date had resumed his official duties at Vicksburg. This modified design was not immediately tested. The Commission lacked available appropriations to do so.
Eai'ly in 1916 plaintiff’s modified design of the launching apparatus was constructed under his personal supervision and subjected to a tidal at Delta Point in July, 1916. The record discloses that this trial was more successful than the *77 preceding one, and concrete' mats were launched and placed in position under conditions “of current flow and intensity such as would rarely obtain on the river.”
The record establishes the fact that the value of plaintiff’s conceptions was entirely dependent upon the efficiency and operativeness of a launching apparatus. A multiple of concrete slabs joined into sections and then into a unitary mattress brought into being a structure of great weight, and the real problem involved was the ways and means of transferring it from the banks of the river to the desired location in the river bed.
The plaintiff did make changes and alterations in the manner of launching the concrete mats and mattresses. The essential changes, as the tests clearly demonstrated, were in the launching apparatus. In 1916 the plaintiff’s final design of a launching apparatus appeared. This is identified as mat-boat 1608. This apparatus was successfully used in 1917 and concrete revetments were placed in the river at Vicksburg and Red Fork under plaintiff’s supervision and direction.
It is conceded that the plaintiff did not on his own account, or at his own expense, ever at any time construct any one of the three structures for which he obtained letters patent. It is also conceded that all the materials which went into the apparatuses involved were furnished by the Government and all expenses incurred in the trials noted, as well as expense incurred by plaintiff, were borne by the defendant and that the defendant has not been reimbursed therefor.
Plaintiff during the entire period required to develop the utility of his conceptions, except when on vacation or change: of assignment, was in direct charge of revetment work and obviously what he did was in the direct line of his- employment and accomplished as a part of his regularly assigned duties.
The findings of fact correspond in detail to the provisions of the special jurisdictional act. There exists a long’ line of decisions, too many to cite, which establish the rule that where an employee makes an invention, does no more than disclose it on paper, allows and encourages his em *78 ployer to develop tbe same at his expense, supplying all the materials, paying all the expenses, and the additional ways and means of reducing it to practice, the employer acquires a nonexclusive implied license to use the same. United States v. Dubilier Condenser Corp., 289 U. S. 178; Gill v. United States, 160 U. S. 426; Knapp v. United States, 46 C. Cls. 601.
The facts in this case as to patent 1229152 bring it within the above rule as will hereafter appear, unless, as the plaintiff contends, these same facts extend and apply only to the quantum of compensation to be allowed in the event infringement of this patent by the defendant is determined.
When the provisions of a special jurisdictional act enjoin the court to determine the amount of compensation, if any, a patentee may be awarded for an infringement of his patent upon the basis of facts, which if found constitute a complete defense to the award of any compensation at all, it is difficult to ascertain the legislative intent with respect to this issue.
The report of .the Committees having under consideration the special act in this case indicates that Congress intended no more than to refer the case to this court to be adjudicated as other patent cases are. under patent law. Congress was aware of plaintiff’s governmental service and of the contributions made by the Government to the development of plaintiff’s patents, and manifestly reserved the right to offset any award of compensation to the extent of the value of said contributions. The report of the committee appears in the appendix to this opinion.
This report, in view of the record in this case, contains several unintentional inaccuracies; at least the testimony in this case does not sustain its statement of facts in every particular. The court’s findings disclose the variances. The debates in Congress occurring during the consideration of the special act unmistakably disclose that it was not intended in referring the case to this court to waive available governmental defenses, except the statute of limitations and the prohibition of plaintiff’s right to sue as expressed in the acts of 1910 and 1918 (supra). Binns v. United *79 States, 194 U. S. 486; Gay v. Ruff, 292 U. S. 25, 31; United States v. St. Paul, Minneapolis & Manitoba Railway Co., 247 U. S. 310, 316, 317.
One may conceive an invention and procure a patent for it while in the Government service under circumstances which do not give rise to an implied nonexclusive license upon the part of the Government to use it. Dubilier Condenser Corp. v. United States, supra. Congress was aware of the law in this respect and, recognizing it, provided that in the event plaintiff’s case fell within the law, nevertheless when it came to the issue of compensation such Government services, etc., were to be considered. They were not waived as a defense in the first instance. Familiar as the rule is, it is essential to state that the issue as to whether the patentee is the original and sole inventor of the patents involved relates to validity or invalidity of the patents. The issue as to infringement and compensation for the same is secondary. It is elementary that one may be the original and sole inventor of patented devices or mechanisms and still be unable to recover compensation for the use of the same by another. The user may be entitled to an implied license, a shop right, and may be able to establish a right of user without payment of compensation aside from these.
The plaintiff cites the case of Dahlgren v. United States, 16 C. Cls. 30. This precedent he confidently asserts sustains in every particular his construction of the special jurisdictional act. The report of the committee heretofore referred to mentions the Dahlgren ease and states that the special act in this case “follows to considerable extent” the provisions of the special act referring the Dahlgren case to this court, and this statement is true.
It is also true that when the Congressional Committee observed the similarity, word for word, between the Dahlgren act and the one in the first bill introduced in the instant case, it immediately amended the latter and omitted all reference to the purchase of the plaintiff’s patents, and obviously gave heed to the letter of the Secretary of War addressed by him to the chairman of the committee on March 1, 1927. Aside from this fact, however, we have grave doubt, in view of *80 more recent decisions of tbe Supreme Court, whether the DaMgren case may now be regarded as a controlling authority.
Special jurisdictional acts, it has long since been held, are to be strictly'construed. The court may not consider moral obligations or look beyond the terms of the act for seeming injustices. We can not assume in the face of apparent ambiguity that the Government assumes a legal liability or any basis for one if the act itself leaves open a grave doubt as to the intent of Congress in this respect. •
If the special act clearly intended that the jurisdiction of this court should only extend to adjudicating whether the plaintiff was the sole and original inventor of the patents involved, and whether or not his patent rights had been infringed by the Government, the act waiving defenses to the right and only minimizing the award of compensation, language indicating this intent was available but not used. Stanton v. United States, 68 C. Cls. 379.
Patent 1173879 in its specifications and claims relates exclusively to a revetment structure, and fig. 6 in finding 5 illustrates the structure in detail. The plaintiff did contend for the validity and infringement of the seven claims of the patent. The court finds claims three (3) and six (6) to be valid and infringed (Finding 41). The novelty of this structure resides in the manner and form of the assembling of the concrete mats in such a way as to enable them to be safely and economically launched into the desired position in the stream.
It was not new to flexibly join together a multiplicity of concrete slabs spaced apart or to reinforce such slabs by the use of reinforcing wires to impart to them flexibility and tensile strength (Finding 38). The Hawkes Canadian patent (finding 37) closely approximates the patent in suit. The distinct difference between the plaintiff’s mats and prior ones is embodied in a form of structure whereby each individual concrete mat is so formed and ingeniously attached to the longitudinal launching cables as to form a concrete mattress which, in the process of launching, causes each mat unit to bear its own weight “in their journey from the ways to their resting place” on the bottom of the stream.
*81 There is no evidence in the record that this method of assembly had ever been used before. Its conception involved invention. The plaintiff did employ certain elements old in the art and in the way specified adapted them so as to function in a new and novel way.
The problem confronting plaintiff was not the construction of individual concrete mats. What the inventor had to do was to take a structure of unusual weight and attach it to cables of unusual strength in such a way as to move the same from one position to another without danger of disruption and without the accompanying danger of never being able to devise a launching apparatus which would operate to accomplish a successful launching of the same.
The plaintiff’s novel method of attachments solved the problem. Plaintiff filed his application for a letters patent covering his concrete revetment structure on December 30, 1914, and by so doing reduced it to practice. It is true the plaintiff did not at his own expense and from materials owned by him construct a concrete mat, but he did supply detail blueprints and specifications sufficient in every particular to enable one skilled in the art to construct such mats, and his application for a patent embodied the same. Tlie Mississippi River Commission adopted this patent and used the same.
The defendant indavertently states in the brief “No device embodying any of the alleged inventions was built, nor application filed until after April, 1915.” The application for patent 1173879 was filed on December 30, 1914, and the patent was granted on February 29, 1916. Hence it is apparent that on December 30, 1914, the plaintiff had constructively reduced his patent to practice and his statutory monopoly dates from February 29, 1916. Automatic Weighing Machine Co. v. Pneumatic Scale Corp. 166 Fed. 288, 297. Telephone cases, 126 U. S. 1.
One defense interposed to the award of any compensation for the use by the Government of patent 1173879 is predicated upon the doctrine of a nonexclusive implied license to use the patent. No doubt the Government is entitled to assert such a defense; this is conceded. To sustain the contention reliance is had upon the proved facts and circum *82 stances under which the Government did use the patent, deducing from these facts a conclusion that the Government by furnishing the funds and materials to construct the mats and subjecting them to tests after completion thereby enabled the plaintiff to develop his conception and obtain his patent, a proceeding in which the plaintiff acquiesced and in which he participated without claiming compensation at the time of user.
As we perceive it, the defense is vulnerable from the standpoint of law and fact. True, the defendant challenges the validity of the patent and infringement of the same. On these issues our decision is adverse. Therefore, under the cases cited the invention covered by plaintiff’s patent 1173879 was developed and reduced to practice by him prior to defendant’s tests which began in April, 1915, and continued until 1916. It is one thing to subject a fully completed invention, well defined and. covered by an application in the Patent Office, to tests in order to ascertain its availability for a particular use, and quite another to engage in experiments and other activities to create and develop one.
The plaintiff did acquiesce in the tests and supervised them as stated in the findings. He was anxious and so was the defendant that they should demonstrate the utility of the mats. The tests did not demonstrate a need for any substantial change in mat construction, and as a matter of fact the principle embodied in their construction was then as it is now, and as it was on the date the plaintiff disclosed his conception to the officials of the Mississippi River Commission. The plaintiff sought compensation for the use of his patents soon after they were granted and his superior officer acknowledged their worth and would have compensated him if under the law he could have done so.
Patent 1173879 is not a basic invention and in no sense a pioneer one. It is limited, as previously stated, to the novel method of connecting the concrete mats to the launching cables whereby the new and novel result is obtained of unifying the excessive weight of the same to a single concrete unit, enabling a successful launching of a concrete mattress *83 to be obtained. Its value is limited to the value of this accomplishment.
The invention covered by patent 1229152 under the facts of record was developed in the regular course of plaintiff’s governmental duties from materials furnished by the Government, and without expense to the plaintiff. We have heretofore given the detail history of the development of this patent. It is now only necessary to state that plaintiff’s original conception of a launching apparatus disclosed in October, 1914, is not identical with the patent disclosures.
Plaintiff’s October, 1914, launching apparatus did not successfully function in accord with his conception. The Green-ville tests not only demonstrated this fact but pointed out to plaintiff the particular imperfections causing the failure, and he profited by the tests and thereafter changed his first concept of a launching apparatus in order to overcome them.
The changes made by plaintiff following the Greenville tests enabled the production by plaintiff of his blueprints dated August, 1915, disclosing his modified design. The test made of this launching apparatus at Delta Point July, 1916, proved its operativeness, but plaintiff was not satisfied with this design, for on some date during the year 1916 he prepared the designs and drawings for the “mat-boat” 1608, and upon this design and drawings he filed his application for a patent.
As has been previously stated, the findings show, and the record amply supports them, that plaintiff’s invention covered by his patent 1229152 was developed by him in the course of his official duties, at the expense of and from materials belonging to the Government. The perfected launching apparatus upon which plaintiff’s patent was granted came into a completed unit by virtue of the activities of the Government in connection with plaintiff’s engineering ability, and in our opinion the Government obtained a nonexclusive license to use the same. Gill v. United, States, and Knapp v. United States, supra.
Plaintiff’s recovery is limited to the infringement by the United States of claims 3 and 6 of patent 1173879. Pursuant to an agreement of the parties it is ordered that the case *84 be remanded and referred to Commissioner Gordon to take testimony upon the question of reasonable and entire compensation as to claims 3 and 6 and report to the court. As to patent 1229152 the petition is dismissed for the reasons stated. It is so ordered.
Whaley, Judge; Williams, Judge; Littleton, Judge; and Green, Judge, concur.

*55

*57

*84 Appendix
Calendar No. 1154 — Senate
71st Congress, 2d Session. Eeport No. 1118
David McD. Shearer
June 27, 1930. — Ordered to be printed
Mr. Howell, from the Committee on Claims, submitted the following
Eeport
[To accompany H. E. 1825]
The Committee on Claims, to whom was referred the bill (H. E. 1825) for the relief of David McD. Shearer, having considered the same, report favorably thereon with the recommendation that the bill do pass with the following amendment:
On page 2, line 17, strike out the word “will” and insert in lieu thereof the word “willow”.
The facts are fully set forth in House Eeport No. 763, Seventy-first Congress, second session, which is appended hereto and made a part of this report.
• [House Eeport No. 763, Seventy-first Congress, second session]
The Committee on Claims, to whom was referred the bill (H. E. 1825) for the relief of David McD. Shearer, having considered the same, report thereon with a recommendation that it do pass with the following amendments:
In line 1, on page 2, after the word “determine” insert the following words: “any statute limiting the time within which *85 such an action may be brought to the contrary notwithstanding”.
In line 2, on page 2, strike out the word “and”, insert a comma after the word “first” in the same line, and insert the words “and sole” after the word “original”.
In line 4, on page 2, strike out the word “and”, insert a comma after the word “first” in the same line, and insert the words “and sole” after the word “original”.
In lines 9 and 10, on page 2, strike out the comma and insert a period after the word “adjudication”, strike out immediately following the word “adjudication” the words “and for a full and entire transfer of said several patents to the United States”, and insert in lieu thereof the following-words :
“The Court of Claims shall ascertain whether or not it is to the interest of the Government of the United States to use such patents, or either of them, after the date of said adjudication and, if it shall find that the said David McD. Shearer was the first, original, and sole inventor of said inventions and that it is to the interest of the Government of the United States to use said inventions, or any of them, after such adjudication, the Court of Claims shall render such judgment as will assure a full and entire transfer of. said patents or such of them as should be so transferred and shall award to the said David McD. Shearer such compensation therefor as shall represent the value of the patent or patents awarded to the Government of the United States.”
In lines 10 and 11, page 2, strike out the words “and in determining” and insert in lieu thereof the following: “In determining whether or not said David McD. Shearer is entitled to compensation and”.
In lines 13 and 14 of page 2, strike out the words “as bearing on the question of reducing or increasing such compensation” and the comma following “compensation” line 14 of said page.
STATEMENT OF FACTS
The evidence before the committee presents the following-facts :
That the claimant, Capt. David McD. .Shearer, graduated as civil engineer in the Agricultural and Mechanical College of Texas in June, 1909.
He served under the Mississippi Eiver Commission in the third district, from September, 1909, until the declaration of war against Germany in 1917, when he entered the United States Army as captain of Engineers. Went overseas, served *86 in training, and in the Battle of the Argonne, France; later at headquarters of First Division in Germany, France, and this country.
He served with the Mississippi River Commission from 1909 to 1917 as junior engineer, acting as levee inspector, mechanical draftsman, and surveyor, mechanical engineer, superintendent in charge of willow bank revetment parties, water parties, inspector of creosoted lumbex*, and finally, from December, 1916, to May, 1917, operating a concrete revetment party making and laying concrete revetment, which is his own invention.
In 1914, outside of office hours and not interfering with his duties and service as employee of the Mississippi River Commission, he invented a reinforced-concrete revetment; also molds for manufacture of said reinforced-concrete revetment ; also apparatus for laying said reinforced-concrete revetment. He applied for and obtained patents on each.
The United States Government, through the Mississippi River Commission, adopted and used all three of said inventions, covered by said letters patent, is still using them, and is planning for their extensive use in the future.
This bill does not carry any appropriation.
This bill does not commit the Government'to make any expenditures.
This bill simply provides a means by which Capt. Shearer may have consideration, by a competent judicial tribunal, and adjudication of his claim for compensation for such use of his said inventions, and if found entitled to compensation therefor to be awarded judgment for the compensation justly due him.
This bill is based upon and follows to a considerable extent the provisions of the act of Congress approved June 19,1878 (20 Stat. L. p. 583), by which Congress conferred jurisdiction on the Court of Claims to adjudicate the claim of the estate of Admiral John D. Dahlgren for compensation for the adoption and use by the United States of certain inventions relating to ordnance patented by said Dahlgren, who was, at the time of said inventions, an officer in the United States Navy.
Before this invention of Captain Shearer, the only revetment in use for protecting and maintaining the bottom and sides of the river channel, below the water line, was a revetment manufactured from the willows growing along.the banks of the river. This willow revetment was of two kinds, one known as the woven or basket willow, consisting of the smaller willow brush placed at right angles to each other and interwoven like basket work. The other was known as *87 the willow fascine revetment, consisting of larger willow poles laid parallel to each other and fastened at intervals with wire.
There were numerous and serious objections to this revetment formed of willow, some of said objections being the following:
The willow wood being only slightly heavier than water even when thoroughly soaked, the revetment mats had to be sunk by means of heavy weights, generally of rock placed at intervals, in order to press them to the bottom and to hold them there when laid. The great difficulties of thus sinking the mats will be appreciated; secondly, where the willow mats at periods of low water, extend above the water line on the banks, the wood being alternately wet and dry rapidly deteriorated and rotted; third, there was great difficulty in laying and maintaining the rocks or weights for holding down the willow mats, especially on the slopes or sides of the channel; fourth, there was a great tendency to breaking and lifting the ends or edges of this willow mat through movements of snags or undermining by the river current, and when the edges started to lift the weights holding the balance of the mat were displaced and great sections of the mat would roll up and be destroyed or washed away; fifth, the supply of willows for making revetment was becoming alarmingly scarce.
That this claimant, from his practical experience and observation, appreciated these shortcomings of the willow revetment and undertook the study of some improved form of revetment. By long application to the subject he invented a revetment consisting of concrete slabs or sections of rectangular form, 8 or 4 inches thick, having molded through the body of the slab wires, the protruding ends of the wires forming a means for attaching the slabs to each other, thus forming an extended sheet or mat of revetment.
The great and obvious advantages of this revetment over any previously used were as follows: First, the specific gravity of the concrete being much greater than water, it would sink readily and remain permanently where it was laid; second, it would form a floor for the bottom and sides of the river channel having the permanency of stone; third, being formed in sections with wire connections, it had all of the advantages of flexibility, which enabled it to fit the river bottom when laid and to conform to any minor changes in the river bottom or banks that might later occur; fourth, it required no weights, subject to shifting of position, to hold it down; fifth, where this reinforced-concrete revetment extended above the water line of the banks at times of low *88 water there was no rotting or deterioration; sixth, there was no possibility of the edges or ends of this concrete revetment turning up or washing away ; seventh, the supply of concrete is of course unlimited; eighth, the actual cost of making and laying this reinforced-concrete revetment, as tested, fell below the cost of making and laying the unsatisfactory willow revetment.
He finally disclosed the character of his invention to his superior officers in the third district and at the same time applied for and obtained patents as follows:
On reinforced-concrete revetment; application filed December 30, 1914; Letters Patent No. 1173879, issued February 29,1916.
On reinforced-concrete revetment mold; application filed August 20, 1915; Letters Patent No. 1173882, issued February 20,1916.
Apparatus for launching concrete-revetment mats; application filed October 6, 1915; Letters Patent No. 1229152, issued June 5,1917.
The said officers of the third district became interested in adopting and using this revetment in their work on the Mississippi River. This claimant consented to such use and aided and assisted in carrying out the plans for the manufacture and laying of said reinfoixed concrete revetment, employing exactly the form of reinforced-concrete revetment covered by his patent, the molds for manufacture of the same covered by his patent, and the apparatus for laying the same covered by his patent. He never intimated that he would not expect compensation for the use of said patent rights, but when the subject of compensation came up he received evasive answers and failed to obtain from said officers promises of granting such compensation.
Your committee finds that the inventions of Captain Shearer have been used by the Government to a large extent since said inventions were made and since said patents were procured and that it will be found upon hearing of said cause that the claimant is entitled to compensation therefor.
Captain Shearer asserts that he was not employed by the Government to invent or develop any concrete revetment or any revetment aside from the willow type previously in use; that no suggestion was made to him relative to changing the type, and that his study and development of these ideas were absolutely voluntary and independent on his part; that he received no increase in salary from the time he disclosed these inventions to the officers of the third district until he left the service to enter the Army; that he paid the entire expense of said applications for patents, although said ex *89 pense was a heavy burden, in view of his limited salary and the fact that he was a married man.
He asserts that no material or labor paid for by the Government was used in making his inventions. The material and labor furnished by the Government were consumed in making actual use of the inventions for the benefit of the United States. The expenditure by the United States was-in construction of the molds for manufacture of the concrete revetment sections and three sets of apparatus for laying the revetment mats. These molds and machines are, of course, the property of the United States. They will last for years and be available for constant use. These expedi-tures were not made in connection with Captain Shearer’s invention. .
He submits that there can be little or no use for the inventions he has produced except by the United States Government, for the reason that practically all protection of river channels calling for revetment is laid by the United States Government.
The claimant has been actively seeking the right to have made the adjudication herein provided for constantly since said infringement, and bills providing for the reference of said claim to the Court of Claims for adjudication, as herein provided for, have actually passed the Senate at former sessions of Congress. It is therefore deemed just that the claim should be protected from any statute of limitation barring his action, since he has been diligently seeking the right to maintain such action.
The facts as asserted by Captain Shearer are controverted. The bill is carefully safeguarded by the amendments herein proposed and otherwise, and it seems but just that Captain Shearer be given opportunity to present his case to the Court of Claims, that court to determine what compensation, if any, should be granted him.
The letter from the War Department, dated March 1, 1927, is attached hereto and made a part of this report as follows:
War Department,
Washington, March 1, 1987.
Hon. Charles L. Underhill,
Chairman Committee on Claims,
Mouse of Representatives, 'Washington, D. C.
Dear Mr. Underhill : In further response to your letter of February 21,1927, in which you request my opinion as to the merits of Senate bill 8701, for the relief of David McD. Shearer, I have to say that while it is the well-known policy *90 of tbe War Department to encourage invention by those in Government service, to safeguard their interests in their dealings with the Government, and not to oppose legislation designed to give the Government inventor a day in court, that is to place him in the same position with respect to recovering compensation from the Government as is enjoyed by other members of the public; however, from a study of this bill I am constrained to conclude that its text goes considerably further than I have indicated above, and if passed by Congress would place Mr. Shearer in a much more favorable position than that enjoyed by the ordinary private claimant against the Government.
The Judge Advocate General has advised me that the language in line 7, page 2, of the bill, allowing compensation for use of the claimant’s patents before the date of his letters patent constitutes an extraordinary remedy, contrary to the patent laws, and therefore not enjoyed by the public generally. The Judge Advocate General further advises ihat the bill fails to give the Government the right to interpose all of the defenses usual in infringement suits, and for this reason goes much further than merely to give Mr. Shearer a day in court. In this regard, it might be said that if this were an ordinary infringement suit the Government might be able to show that it had an implied license to use the inventions concerned and thus have a complete defense to the action. It is not at all clear that under the language of the bill the Government could so defend in the instant suit. Furthermore, the effect of the bill as submitted is to compel the purchase of the patents in suit by the United States. It is, of course, obvious that compensation for the entire right, title, and interest in the patents would be greater than compensation for a mere license to practice the inventions, and, generally speaking, the War Department is interested in securing licenses only under patents it desires to use. The commercial value of patents for their use in other fields is of no concern to the Government.
In view of the above I find myself not in accord with those features of the bill outlined in the preceding paragraph. I assure you that as to the general purpose of the bill, namely, that of removing the disabilities under which Mr. Shearer now finds himself under existing law for having perfected his inventions while in the Government service, I have no objection whatever.
Sincerely yours,
Dwight F. Davis, Secretary of War.