### GRANT v. KELLOGG CO.

District Court, S. D. New York.
Oct. 2, 1944.

See, also, 3 F.R.D. 229.

Regan & Barrett, of New York City (Edward G. Bathon and Peter J. Baxter, both of New York City, of counsel), for plaintiff.

Simpson, Thacher & Bartlett, of New York City (Whitney North Seymour and Stephen P. Duggan, Jr., both of New York City, and Edwin L. Harding, of Battle Creek, Mich., of counsel), for defendant.

BRIGHT, District Judge.

Plaintiff, by a complaint alleging three causes of action, seeks recovery of substantial damages for an alleged breach of two contracts, one made in November, 1932, which is the subject of the first cause of action, and the other made in June, 1938, the subject of the second and third causes. The terms of both contracts are in dispute.

The contract of November, 1932, was made orally with the defendant through its advertising agency N. W. Ayer & Son, Inc.

The answer admits the making of a contract between it and plaintiff at that time. The complaint alleges that by its terms defendant agreed: (a) at its option to purchase from plaintiff paintings, drawings and sketches of his creations of gnomes and other creatures, solely for use in making reproductions of them as drawn in its advertising material to be circulated in the sales promotion of Rice Krispies; (b) to pay for each separate creation purchased at a price dependent on the value to the advertising material for which it was ordered, and in any event, at a price consonant with sound advertising practice; ·(c) to confine its use of each creation to the Rice Krispies advertising material for which it was ordered, and not to use it for any other purpose or in any extended manner except with permission of and upon terms agreeable to plaintiff; (d) that plaintiff would retain all of his artistic and property rights, present, past and future, in his creations so purchased; (e) defendant would not pirate or simulate plaintiff's creations and would not use in its Rice Krispies advertising copies or imitations made by any other artist or others; (f) if at any time it did not use plaintiff's art work in its advertising, it would thereupon discontinue the use of creations of gnome and gnomelike creatures and all other Grant creations in Rice Krispies advertising, and would thereafter advertise such product from an entirely different angle of approach, and open completely the commercial advertising field to plaintiff for the sale of his creations for all advertising purposes. And plaintiff agreed: (g) to give defendant exclusive use of his creations in all commercial advertising for one year from the date of their first release, except that he reserved the right to sell any of his creations at any time to any person for use as magazine cover designs, illustrations, "spots" or in any non-advertising manner; (h) would not, so long as the contract remained in force, enter into any contract with any competitor of defendant for use of his creations used by defendant in advertising; (i) to make all paintings, drawings and sketches of his creations for Rice Krispies advertising as ordered by defendant or its agents; and (j) to use his best efforts, artistic skill and creative genius in the preparation of his art work.

Plaintiff, concededly a fine commercial artist, whose particular sphere seems to be

the drawing or painting of fantastic figures or animals and the depicting of gnomes, gnomelike creatures, fairy folk, Mother Goose, and other characters, particularly delightful to children, obviously worked to the satisfaction of the defendant for at least six years, from 1932 to 1938, during which time defendant purchased from him much art work used by it in its promotional and space advertising of its cereal known as Rice Krispies. During the first six years of the relations between the parties, the space advertising of this cereal was conducted for the defendant by N. W. Ayer & Son. In November, 1938, defendant changed its advertising agency to J. Walter Thompson Company, and after that change, plaintiff continued to sell some of his art work for Rice Krispies advertising, but for some reason or reasons, about which there is dispute, the relations between the parties were not so smooth and ended in about May, 1942, after which this suit followed.

The contract pleaded clearly was not proven. Whatever was agreed upon admittedly was consummated in November, 1932, and it is not disputed that it was to continue but for one year, during which period defendant was entitled to plaintiff's services exclusively insofar as advertising was concerned. There is no proof that it was renewed or extended. Plaintiff contends, however, that what was then agreed upon applied to whatever subsequent dealings he had with the defendant. In the absence of proof as to its agreed continuation, it is doubtful whether the court can indulge in any such assumption. Jones v. Mencik, 3 Cir., 286 F. 890, 892. This would seem all the more so in this case, because there is undisputed evidence of subsequent and other transactions of an independent nature with respect to other art work prepared by plaintiff. It would seem more probable that the future, after the 1933 advertising campaign, was to be left to take care of itself, and that whatever thereafter transpired were separate transactions of purchases and sales involving the art work thereafter ordered and delivered.

However that may be, it was stated by plaintiff's counsel in summation that the contract alleged and "boiled down" was, that Kellogg was to buy at its option, Grant was to do the work and to exercise his best artistic skill, Kellogg was not to copy his work, and was to pay him if it extended the use of his work.

It is clear from the evidence, and I so find, that the contract was made by the advertising agency for the defendant, that it was to run during the defendant's 1933 advertising and promotion campaign, that under it defendant had the right to purchase from plaintiff such paintings, drawings and sketches of gnomes, other creatures, and settings as it might desire for use in its advertising of Rice Krispies, that it was to pay for such art work a price agreed upon between the parties, usually dependent upon the use to which the particular art work was then to be put; and that plaintiff agreed to use his best efforts, artistic skill and creative genius in the preparation of such art work, to give to defendant the exclusive right to use the same in its commercial advertising of Rice Krispies during the year mentioned, and would not sell his art work for advertising purposes to any competitor of defendant but would be free to sell any of it at any time to any person for use as magazine covers, designs, illustrations, "spots", or in any other non-advertising manner. It was further agreed that after the termination of the 1933 campaign plaintiff would be free to engage in the sale and production of whatever art work he might see fit, except that if he sold it to any competitor of defendant he could not expect to do so to defendant.

The proof shows that after 1933 plaintiff sold to other advertisers many of his paintings, drawings and sketches during the period of his relations with defendant.

There is no dispute that the question of title to the art work purchased and sold was never expressly discussed between the parties at the time the contract was made, or at any other time until after the change was made in the advertising agency from Ayer to Thompson in 1938. So far as the evidence shows, there was no express reservation of any title on the part of the plaintiff. Whatever implications may have arisen as a matter of law are disputed. Such evidence as there is in that respect is contained in the writings. The purchase orders from Kellogg to plaintiff and the invoices submitted by plaintiff for the art work prior to 1939 contain no statements upon the subject; they are what one would usually expect in an ordinary sale and purchase. It is clear that plaintiff was informed that the defendant preferred to own the art work out-right. As early as May 1933, he was written (with reference,

it is true, to the proposition of paying a royalty on the Mother Goose booklet) that it had been the defendant's plan to own the material purchased outright; and in answer to that letter plaintiff wrote that he had been told from time to time that the defendant liked to control all of the rights to the art work purchased and that he was disposed to make that possible. Defendant, as late as January, 1938, wrote that once art work was purchased by it and used, it became its property.

Plaintiff had never reserved any title to any of his work and had never copyrighted any of it previous to his employment by defendant. All of the work purchased by defendant was retained by it, and on one or more occasions plaintiff had requested of defendant permission to use some of it. And defendant, without objection by plaintiff, had on occasion copyrighted work purchased by it from him.

The question then remains whether or not defendant, by the purchase of plaintiff's art work, acquired full and complete title, without any reservation of rights in Grant, the determination of which, it seems to me, will solve the problem of what the contract really was.

█ It is, I think, well settled that the art work here involved is personal property, transferrable by sale and delivery, and there is no distinction in that respect between it and property of any other description. Paintings are no exception to the general rule. Parton v. Prang, 18 Fed.Cas. pages 1273, 1278, No. 10,784; Maurel v. Smith, 2 Cir., 271 F. 211, 214; Waring v. WDAS Broadcasting Station, 327 Pa. 433, 194 A. 631–634; Palmer v. DeWitt, 47 N. Y. 532–538, 7 Am.Rep. 480.

█ If in the transfer there was any limitation for the benefit of the plaintiff, that limitation, restriction or reservation, whatever it may be called, must have been expressed and clearly imposed. Otherwise it will not be presumed. American Tobacco Co. v. Werckmeister, 207 U.S. 284, 297, 28 S.Ct. 72, 52 L.Ed. 208, 12 Ann.Cas. 595; Dielman v. White, C.C., 102 F. 892, 895; Dam v. Kirk La Shelle Co., 2 Cir., 175 F. 902–904, 41 L.R.A.,N.S., 1002, 20 Ann.Cas. 1173; Yardley v. Houghton Mifflin Co., 2 Cir., 108 F.2d 28, 31, certiorari denied 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029; Pushman v. New York Graphic Society, 287 N.Y. 302, 39 N.E.2d 249.

█ The burden of showing such limitation was upon the plaintiff, and there is no such showing, unless, as he contends, the provisions of the alleged oral agreement that defendant would not copy and would pay plaintiff for any extended use implied such limitation. Dielman v. White, supra. Yardley v. Houghton Mifflin Co., supra.

█ The allegation in the complaint is that there was an express agreement that he was to retain all of his artistic property rights, present, past and future, in all such art work. The evidence lacking any express statement upon the subject, and the law denying any such implication, it seems to me, under the authorities cited, plaintiff must fail in this contention.

Plaintiff calls attention to the fact that the form of the purchase orders was changed from time to time to encompass beyond question defendant's assertion of full title to plaintiff's art work. The first assertion by plaintiff of any title to the characters "Snap" "Crackle" and "Pop" was after the agency had been changed from Ayer to Thompson in November, 1938. The plan to change the form of the purchase orders had been under consideration before that. After it was obvious that there was a question, both parties, on advice of counsel, took steps to bolster their position, the defendant by the insertion from time to time of clauses in its orders which, from its point of view, left unambiguous its claim, and the plaintiff by oral and written self-serving declarations, for a similar purpose. Perhaps, a clear cut denial by defendant of plaintiff's claim, and an answer to plaintiff's letters and statements that his contention had no merit, might have been a better way to bring the question to a focus. But the action of neither in 1938 or 1939 could make retroactive what had not been agreed upon in November, 1932, the date when the agreement was made upon which plaintiff rests his first cause of action.

In addition, he admits that defendant has the right to copy again and again the art work purchased by it so long as it copies it as it is and for the same purpose for which it was sold, it cannot use it for other purposes nor copy parts of it or use it in different surroundings because that would be an imitation of plaintiff's concept or idea of what gnomes should look like.

The gnomic field of art is wide and practically unlimited and has been so from time

immemorial. The use of gnomes and fantastic representations of them and of other creatures has been indulged in in advertising, illustration and in fine art work, by defendant and others, long before and since plaintiff engaged therein. Regardless of this, plaintiff, in so many words, claims a monopoly on the drawings of the particular characters of Snap, Crackle and Pop, which he prepared for the defendant. He has no copyright and never attempted to procure one. He admits that, without his objection, defendant has from time to time procured copyrights on many of its advertisements containing his art work picturing these characters and the words Snap, Crackle and Pop.

■ When plaintiff furnished his art work to the defendant for publication, he lost whatever common-law rights to copy he possessed. Palmer v. De Witt, 47 N.Y. 532-539, 7 Am.Rep. 480. His right thereafter to publicize or copy was protected only by the Copyright Law, 17 U.S.C.A. § 1 et seq., which did not sanction an existing right, it created a new one. Caliga v. Inter Ocean Newspaper, 215 U.S. 182, 188, 30 S.Ct. 38, 54 L.Ed. 150.

■ His ideas or conceptions could not be made the subject of a copyright or the basis of rights. They would become such only when executed and in being. And when executed and sold, they were gone from his control. Pushman v. New York Graphic Society, supra; Yardley v. Houghton Mifflin Co., supra.

A contention similar to that made by plaintiff, that he did not sell his concept of what gnomes should look like, was made and overruled in the case of Parton v. Prang, 18 Fed.Cas. 10,784, and such overruling seems to be in accord with the well-settled law.

■ The common law and the copyright statute do not protect intellectual conceptions, however meritorious they may be, until they have been produced. White-Smith Music Pub. Co. v. Apollo Co.. 209 U.S. 1, 17, 28 S.Ct. 319, 52 L.Ed. 655, 14 Ann.Cas. 628; Moore v. Ford Motor Co., D.C., 28 F.2d 529, 536, affirmed, 2 Cir., 43 F.2d 685; Ansehl v. Puritan Pharmaceutical, 8 Cir., 61 F.2d 131, 137, certiorari denied 287 U.S. 666, 53 S.Ct. 224, 77 L.Ed. 374; Bowen v. Yankee Net Work, D.C., 46 F.Supp. 62, 63; Plus Promotions, Inc., v. RCA Mfg. Co., D.C., 49 F.Supp. 116, 118. There may be literary property in a particular combination of ideas in the form in which ideas are embodied. There can be none in ideas. Fendler v. Morosco, 253 N.Y. 281-287, 171 N.E. 56.

■ The question is asked, was he selling his right to copy his conception of a gnome. It seems to me that he certainly was selling what his conception was as executed in what he sold. As the cases cited above hold, he could not hold his unexecuted conception of a gnome, or what that conception might be inferred to be from what he had executed. He sold all that could be drawn or depicted or used from what he had sold. I cannot conceive but that when he sold his executed representation or conception, he sold the conception. Concededly he has given to the public the right to copy what he had executed. What it is claimed he has retained is his conception of a gnome in other settings or dress or occupations. He cannot retain those except in his mind either in choate or inchoate form, conceived or to be conceived, or as present or future ideas. As such they are not property.

■ The gnomes and their names, if they can be said to have been invented by plaintiff, were drawn for Rice Krispie advertising. They had not been, in the Grant form, exploited or used by him before. It was in that advertising that they had any significance, and for that matter, any value. They had acquired no secondary meaning, as being Grant's; they were Kellogg's. They had not been publicized except to forward Rice Krispie sales, and never had any personality or characteristic except as Rice Krispie salesmen. They lived no life like Mutt & Jeff, Buster Brown and his dog, Jiggs, Superman, Betty Boop, Sparkplug, and other inhabitants of the comic strip world. They had no significance except as decoys to beguile the public into reading about Rice Krispies.

Further gnomes and other persons had been used by Kellogg before Grant's employment. The fact that the cereal crackled and popped when cream or milk was poured on it had caused the purchasing public to make inquiry about it, and was the reason for the "noise theme" in advertising long prior to 1933. Grant's contribution was to make more attractive and to give more child appeal to that established theme. His illustrations undoubtedly did that, and it might be said that he, to some extent, personalized the gnomes, and named

them "Mr. Snap", "Mr. Crackle" and "Mr. Pop".

His contention now made is that they could not make use of his idea or theme. But the idea and theme were Kellogg's. Its subsequent development, under the deft mind and fingers of Grant, were but the result of a natural growth and a desire on both parties to catch the eye of the purchaser with a changing picture but a repeated message. To accomplish that Kellogg spent large sums of money, and Grant was the recipient of a substantial part of it for his effort. It is not to be implied that defendant intended to give up what constant advertising had built, when and if Grant, voluntarily or otherwise, ceased his employment by it. If the theme and advertising idea, or slogan, whatever it may be called, so well ingrained in public notice after six years of extensive and expensive advertising, were to be proscribed by Grant's defection, voluntary termination of service, or expulsion, or even death, all benefit from its large investment and extensive advertising campaign would cease. To imply any such result, to my mind, is contrary to the authorities, against the weight of the evidence, and entirely unreasonable.

The statement by the defendant's witness Jordan of Ayer & Co. that his agency would not copy, was limited to his answer to plaintiff's question as to whether, if he submitted a design, the agency would hire or permit a cheaper artist to copy it for the finished advertisement. It is clear to me that the right of reproduction by others applied only to designs submitted for acceptance and not to the reproduction of art work after acceptance, payment and use.

■ The complaint is that defendant has simulated, imitated and pirated copies of plaintiff's creations of gnomes and of his three characters "Snap", "Crackle" and "Pop". But assuming that defendant had no right to do so, which I find to the contrary, it is clear from the testimony of all of the expert witnesses that they had no difficulty in distinguishing Grant's work from the puppet and other reproductions of gnomes used by defendant in its advertising and made by others than Grant. They are not copies that would deceive the trained eye or reflect on plaintiff. They carry out, of course, the noise and sales theme inaugurated by defendant, and developed in part by the artistry of plaintiff. As such they may be said to simulate what plaintiff was employed to do, but such simulation is not a violation of his rights, contractual or otherwise.

■ That portion of plaintiff's claimed contract as described under subdivision (e), that if at any time defendant did not use plaintiff's art work it would discontinue the use of Grant's creation and would advertise Rice Krispies from an entirely different angle of approach, and open completely the commercial advertising field to plaintiff for the sale of his creations for all advertising purposes, has not been proven.

To say the least, it is a most unusual clause to be found in any such a contract. It precludes the defendant from the benefit of six years of advertising, in which it has invested millions of dollars, without any corresponding benefit to plaintiff, and in absolute disregard of the fact that he has been paid for his contribution. It deprives defendant of a theme and method of advertising that was its own before Grant was employed. Nowhere in the testimony is there any intimation that any such result was talked or written about. And any such an agreement would place defendant practically at the mercy of plaintiff. He could clamp down on defendant's well-established method of advertising whenever he saw fit, and without reason. Its prohibitory effect, as pleaded, would be complete whether plaintiff refused to work for defendant any longer, or whether his employment was otherwise terminated. He would thus control the advertising policy of defendant, for over the years of his employment he has drawn all kinds of figures, gnomes, animals, birds, scenes and other designs.

But says plaintiff, that although expressly alleged, such a result may be implied from the alleged agreement not to copy and to pay for any extended use to which art work submitted by plaintiff might be put.

■ The implication is not one which I care to adopt. I have already discussed the claim of wrongful copying. As to extended use, it is clear that defendant agreed to pay for art work accepted from plaintiff a price agreed upon and which was usually determined by the use to which the particular item was to be put. There is accord in the testimony as to that. There is dispute, however, as to whether the use to which such art work might be put

after its original application would entitle plaintiff to additional compensation.

I find that it would not. Plaintiff says that subsequent payments to him for extended use prove his contention; that what the contract was understood to mean is best shown by what the parties did under it.

He cites three instances upon which he relies. In April, 1933, while the original exclusive contract was in force, Snyder & Black, lithographers, in carrying out one of defendant's orders for the making of window trim "blew up" (enlarged) plaintiff's drawings, and asked him to sign the enlargement which he refused to do, because he considered it inferior, and of which he complained. It was arranged that he should do the necessary art work, which he did and for which he was paid $250 by Snyder & Black. In April or May, 1934, he was asked to stand by to prepare window trim for the same lithographer which he did. He did not get the work, it was done in another manner using his design, and he complained that thereby Snyder & Black were endeavoring to avoid an art charge. After some negotiation, and on being told to get together with the lithographer, he was paid $50 for his sketch, and $250 for work which he did not do and which he billed on the basis of "one headache". On another occasion he had drawn a duck for a posterette. That art work was subsequently and in 1935 used as a magazine advertisement and also on a twenty-four sheet billboard poster. He was paid $250 for the magazine ad but nothing extra for the bill board poster.

On the other hand, it appears that there were many other instances of extended use for which he was not paid and against which he made no protest, or as to which his protest was overruled. In May, 1933, a broadside was gotten out by defendant in which Grant's little figures were used and of which he was advised. In June, 1933, a posterette was made of a large poster drawn by plaintiff and there was no claim for compensation or a protest. In October, 1933, he was asked to make three small drawings which he considered might be used for trademarks and as such he sought to charge $400, but it was reduced to $200. On that occasion it is true that he was told defendant had no thought of trademarks as an advertisement. In 1938 his painting of Humpty Dumpty, originally purchased for use as a premium, was placed on a bill board and he received nothing extra for such use, although he protested. Some of his designs were copyrighted by defendant and he did not object. In 1939 defendant refused to pay for the extended use as magazine ads of four prints made for premiums, and plaintiff accepted payment of his bill knowing that item had been stricken. And it appeared that there had been extended use of other art work, which has not been specifically enumerated. And in May, 1941, plaintiff's attempt to limit the use of his poster design "Cool Crisp" to 1941, was disregarded and he was so notified.

The fact that on the three occasions mentioned he received additional compensation, and on other occasions he either claimed nothing or his protest was disregarded, convinces me there was no contract upon the subject between him and the defendant. Those payments made seem to me to represent more an incentive payment rather than an obligatory one, and did not ripen into a binding agreement.

Except in 1933, the only restriction in his market for any of his work was to those who competed in the same field with the defendant; and after that he could have sold, knowing, however, that defendant then would not buy. And his work for defendant now having terminated, he is free to indulge in his calling in any commercial advertising field, subject only, as I see it, to defendant's copyrights.

But aside from these considerations, it seems to me that the purpose of his employment or of his contract is decisive. He was employed or engaged by contract, whichever may be the case, to prepare and submit art work for Rice Krispies advertising. He did what he was engaged to do, and what he did belonged to the one who employed him or with whom he contracted. He did nothing more than he was asked to do. There is no reason that I can see, that merely because his art work so submitted and paid for was commercial advertising or commercial art work (and, as plaintiff says, of no intrinsic value except for the purpose for which it was made and purchased), any different principle would or should apply. Gill v. United States, 160 U.S. 426, 435, 16 S.Ct. 322, 40 L.Ed. 480; Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 248, 23 S.Ct. 298, 47 L.Ed. 460; Lumiere v. Robertson-Cole Distributing Corp., 2 Cir., 280 F. 550, 552, certiorari denied 259 U.S. 583, 42 S.Ct. 586, 66 L.Ed. 1075;

Dielman v. White, supra; Yardley v. Houghton Mifflin Co., supra; Colliery Engineer Co. v. United Correspondence Schools Co., C.C., 94 F. 152, 153; Tobani v. Carl Fischer, Inc., 2 Cir., 98 F.2d 57, 59, certiorari denied 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420; Brown v. Mollé Co., D.C., 20 F.Supp. 135, 136.

The second and third causes of action were dismissed at the close of the plaintiff's case. They were based upon a contract claimed to have been made in June, 1938. It involved the preparation by plaintiff of twelve print drawings which were also to be reduced so that they could be adapted for the back panel of the Rice Krispies package. Defendant intended to offer the full size prints as a premium to the public in return for box tops plus a stamp. The agreement contemplated the payment of a royalty and was confirmed by the note of the plaintiff on June 22, 1938, which stated that the advance royalties for the use of 20,000 prints of each of the twelve subjects drawn by him would be $4,200, and on any excess of 20,000 his royalties would be ½¢ per copy. The contract apparently was made by plaintiff with Mr. Olmstead of the Kellogg Company, and it was stated by Olmstead in a letter of June 20, 1938, to Mr. Jordan of the N. W. Ayer & Son Agency that plaintiff was to receive $150 for each package panel design and $350 each for the full color paintings plus a ½¢ royalty on each print if it should run more than 20,000. The twelve drawings were prepared to the satisfaction of the defendant.

There is dispute as to what the contract referred to, the defendant contending, and the plaintiff not remembering exactly, that the payment of royalties was to be made for prints used in promotional work only, in other words, for prints used only as premiums. The real meaning of the agreement, however, it seems to me, was definitely settled by the letter written by plaintiff to Mr. Allen of the J. Walter Thompson Company on December 16, 1938, in which plaintiff stated definitely that his agreement with the defendant was for $350 for each original drawing, $150 for the adaptation to the panel illustrations, and in addition, plaintiff was to receive ½¢ per print distributed beyond the quantity of 20,000, and in which he wrote further: "In case the agreement with me in relationship to the print drawing should become confusing, I want it understood to anyone concerned that it was both the Kellogg Company and my understanding that the royalty involved applied to the prints where they were used as premiums. * * * I do not expect the royalty charge to apply to magazine, newspaper, car card or poster advertising." Notwithstanding this definite statement, on April 15, 1939, plaintiff sent a bill for $2,000 for the use of four of the print drawings for advertisements in magazines, posters, etc., and other than for premiums, along with three other bills for other work done by him. In the letter in which he sent the bills he wrote: "I do not feel it would be fair on my part to attempt to hold the Kellogg Company to the royalty agreement for their use in general advertising, namely, ½¢ per print. However, I do feel I should receive a reasonable bonus for this extended use". The defendant refused to pay the bill but did pay plaintiff $3,150, which amount plaintiff accepted and made no further demand for the print drawings.

My action in granting the defendant's motion for a dismissal of the second cause of action was based upon the foregoing testimony and writings of the plaintiff, as to which there was no dispute. It appeared clear to me from the uncontradicted evidence that he had been paid in full for all royalties which he was entitled to receive under the agreement for the print drawings, both because his contract contemplated no further payments of additional royalties of ½¢ except for the use of his drawings as premiums in excess of 20,000 copies, and because of his letter and acquiescence in the refusal of the defendant to pay the additional charge of $2,000 made by him for the drawings, accepted the amount paid, and made no further claim until the commencement of this action.

His third cause of action is for $8,000 based upon an extended use of these print drawings for general advertising purposes and other than for premiums. For the same reasons mentioned for the dismissal of the second cause of action, I granted the defendant's motion for a dismissal of the third. There was a clear-cut refusal to pay any additional sum, plaintiff accepted the amount tendered, and until the commencement of this action made no further claim. And it is also clear from his letter of December 16, 1938, that he did not expect any additional payment for the use of the drawings for magazine, newspaper,

car card or poster advertising. His action in accepting the amount paid by defendant confirms me in that decision.

The first cause of action, seeking damages for alleged wrongful copying, for alleged extended use, and for failure to discontinue the use of plaintiff's creations after the termination of his employment, must also fail.

The complaint will be dismissed upon the merits. Findings may be proposed by defendant on or before October 16, 1944, and served upon plaintiff's attorneys, who may have one week in which to present objections. Thereafter I will file formal findings as required.