**AUTRY v. REPUBLIC PRODUCTIONS, Inc. et al.**

**No. 13596.**

United States District Court, S. D. California, Central Division.

May 13, 1952.

Gang, Kopp & Tyre, Los Angeles, Cal., for plaintiff.

Loeb & Loeb, Los Angeles, Cal., for defendants.

HARRISON, District Judge.

Plaintiff, a well-known star of radio, movies and television, seeks to restrain the defendants, Republic Productions, Inc., (hereinafter referred to as Republic) and Hollywood Television Service, Inc., from licensing for exhibition on home television receivers fifty-six films owned by Republic and in which plaintiff appeared in starring roles.

Plaintiff has and claims no property interest in the films themselves but does contend the showing of these films on home television, either on a "sustaining" or "sponsored basis", would constitute "commercial advertising"; that such "commercial advertising" is in violation of the contracts of employment between Republic and himself. Plaintiff further contends that this is unfair competition with the "commercial advertising" business which the plaintiff has established during the years of his fame and public acceptance.

Defendants' reply to these contentions is that pursuant to the contracts between the parties, and by virtue of defendants' copyright control of said films, defendants' right to license the exhibition of the pictures are unrestricted. Lillie v. Warner Bros. Pictures, 139 Cal.App. 724, 34 P.2d 835.

This case presents one of the many questions constantly arising as a result of the impact of television upon the entertainment world.

Plaintiff first entered the entertainment field in 1928 or 1929. Between that time and his first film contract, he performed on various radio programs, made personal appearances and records, and granted the first of many commercial endorsements.

By 1933, plaintiff testified, his yearly income was about $15,000.

On or about September 4, 1934, plaintiff entered into a contract of employment with Mascot Pictures Corporation. This contract was assigned by Mascot to Republic June 11, 1935, and under the provisions of the 1934 contract and its assignment, plaintiff was featured in eight pictures.

Further employment contracts were entered into between plaintiff and Republic in the years 1936, 1938, 1942, and 1946. No pictures were made under the 1942 contract but its terms were apparently incorporated in the 1946 contract. The 1934 contract was a "term" contract. The other contracts are what is known as "multiple picture contracts". The photoplays involved herein were produced under said contracts, which shall hereafter be referred to as the contracts of 1934, 1936, 1938 and 1946 respectively.

The parties have stipulated that "plaintiff has achieved a world-wide reputation as 'America's Favorite Cowboy' and as a western star of great fame and prominence. The joint efforts and expenditures of defendants and plaintiff in publicizing and exploiting the name and reputation of the plaintiff, the photoplays produced by defendants in which plaintiff appeared, the world-wide release and distribution of the aforementioned photoplays by defendants, plaintiff's personality and ability, and his appearances in rodeos and other type of entertainment on radio and television, have all substantially contributed thereto, but it is not possible to estimate the amount or relative proportion and contribution of each."

When plaintiff entered into the first contract he did not have the benefit of counsel but thereafter was represented by able counsel and an alert agent. As his fame increased his bargaining power increased. Plaintiff's commencement salary in 1934 was $100 per week. The last pictures he made for Republic in 1947, were at the rate of $15,000 per picture. This bargaining power was not only reflected in his increased earnings but also in the freedom of plaintiff to carry on his independent activities in which his name, pictures, photographs and other reproductions of his likeness and voice were freely bartered for use by others.

It has been further stipulated that: "Each of said photoplays was published with notice of copyright affixed and registered under the Copyright laws of the United States in the Office of the Register of Copyrights by and in the name of Pictures (Republic) as the copyright proprietor. Plaintiff has and claims no right to use or to license the use of said photoplays, or his acts, poses, plays and appearances therein for television, or for any other purpose whatsoever, unless defendants consent thereto; except, however, that the plaintiff does not concede that defendants have the unrestricted right to use the same, and particularly urge that defendants do not have the right to use the same in the manner claimed by defendants and specifically set forth in plaintiff's complaint".

The main contention revolves around paragraph 9 of the first three contracts and paragraph 8 of the 1946 contract. The parties have used paragraph 9 of the 1938 contract as an example, consequently, I shall do the same. Said paragraph 9 reads as follows:

"The producer shall have the right to photograph and/or otherwise reproduce any and all of the *acts, poses, plays and appearances* of the artist of any and all kinds during each employment period, and to record for motion picture purposes the voice of the artist and all instrumental, musical and other sound effects produced by him hereunder, and to reproduce and/or transmit the same in connection with such *acts, poses, plays and appearances* as the producer may desire, and the producer

shall own solely and exclusively all rights of every kind and character whatsoever in and to the same perpetually, including the right to use and exploit all or any part of the same in such manner as the producer may desire, and including, as well, the perpetual right to use the name and likeness of the artist and recordations and reproductions of his voice in connection with the advertising and exploitation thereof. The artist does hereby also grant to the producer the right to make use of and to allow others to make use of his name (in addition to and other than in connection with the *acts, poses, plays and appearances of* the artist hereunder), for the purpose of *advertising, exploiting and/or publicizing photoplays in* which the artist appears, as well as the right to make use of and distribute and to allow others to make use of and distribute his pictures, photographs and other reproductions of his physical likeness and of his voice for the like purpose. The producer shall also have the right to 'double' or 'dub' the *acts, poses, plays and appearances* of the artist hereunder and, as well, his voice and/ or sound effects produced by him hereunder to such extent as the producer may desire. The rights granted to the producer in this paragraph shall inure not only to the benefit of the producer, but also to the benefit of all persons who may hereafter acquire from the producer the right to distribute, transmit, exhibit, advertise and/or exploit the photoplays in which the artist appears hereunder." (Emphasis supplied.)

The difference between the parties arises over the meaning of the first two sentences of said paragraph 9. Plaintiff contends the second sentence of said paragraph 9 restricts the grant set forth in the first sentence when read in connection with the other provisions of the contract.

Since completing his contract with Republic plaintiff has established his own production company, specializing in pictures for television. Through the years he also has built up a nation-wide advertising business through which he advertises dozens of products and business institutions. The pictures produced by plaintiff are used as "attention getters", "audience builders", association of the star with the products, endorsement of products, direct or implied, as well as testimonials. Plaintiff has thus combined to his great profit his skill as an actor with the advertising business. He construes the use of advertisements in connection with his televised pictures as "commercial advertising". To me, he has so commercialized his activities that he no longer looks upon his pictures as a feature of entertainment but considers them solely from the viewpoint of the sponsor and the profits derived, ignoring the approach of his unseen audience, which seeks only entertainment and endures the advertising as the price for such entertainment.

In June 1951, Republic through its subsidiary, Hollywood Television Service, Inc., offered to license for televising the photoplays produced under the various contracts with plaintiff. The photoplays were to be used by various sponsors under the following restrictions:

"*Advertising*—Station shall not make or permit to be made, in any advertising, publicity, or otherwise, any statements which, directly or indirectly, expressly or by implication (a) constitute or may be understood to be an endorsement of any sponsor, product, article, or advertising by distributor, the producer or copyright proprietor of the picture, any actor or actress appearing therein, the director, or anyone else connected or associated with the picture, or the production or distribution thereof, or (b) indicate or may be understood as indicated that any such person is connected or associated with, or is employed or engaged by Station or any sponsor. Any advertising or publicity referring to such person shall be limited to, and shall indicate that such person appears in or is rendering services in connection with the specific picture or pictures. All advertising issued, published or paid for by Station, or any sponsor, relating to any picture shall give cast and due credit in the

same manner, as to position and relative size and prominence of type, as such credits appear in the main title of the respective picture."

Thus Republic, by offering the pictures produced under the various contracts, entered the plaintiff's old pictures in competition with his present productions much to the displeasure of the plaintiff. Plaintiff contends the televising of his old pictures is not only unfair competition but contrary to the terms of the various written contracts between the parties. With this contention I cannot agree.

Plaintiff endeavors to differentiate between the exhibiting of motion pictures in theatres to "captured" audiences and exhibiting said pictures over television to the myriad of home television sets. He does not object to the televising of the pictures but does object their being sponsored by an advertiser. He claims that sponsored television is "commercial advertising". Plaintiff in effect tells defendants they may televise the photoplays involved provided their exhibition is without sponsorship. This graciousness on behalf of the plaintiff can be readily evaluated when one realizes, as a practical matter, this would preclude Republic's use or sale of photoplays in which plaintiff appeared.

In the drafting of each contract it is clear the parties herein were aware of the possible use of pictures over television but in none of them is there any restriction placed upon such use of photoplays. At all times the televising of plaintiff's pictures must have been contemplated as indicated in paragraph 20 of the 1934 contract in which the following language is used:

"Whenever in this agreement the terms 'motion picture', 'motion picture production', 'serials', 'features', and/or 'photoplays', or terms of similar tenor are used, such terms shall be deemed to include, but not be limited to, motion picture productions of any length whatsoever, both in the present and future development of the motion picture industry, *including talking motion pictures, television and all forms of motion pictures* and their accompanying devices which reproduce · color, words,

music, and/or sound in synchronism with, accompaniment of, or supplementary to, photograph. * * *" (Emphasis supplied.)

It is clear that the expression *"acts, poses, plays and appearances"*, appearing in the first sentence of the above quoted paragraph 9, refers to photoplays and the second sentence of said paragraph applies to something entirely different.

Saul Rittenberg, one of the attorneys for Republic, was called by plaintiff and testified that he was one of the drafters of the 1938 contract and in explaining the meaning of paragraph 9, testified as follows:

"* * * The first sentence is intended to cover the picture, the ownership of the pictures and the recordings, and the right to use them. The next sentence deals with an entirely different subject, the subject of the right to use Autry's name, the artist's name and likeness and voice for advertising purposes. They are two entirely different things. We can show the picture under the first sentence, and under the second sentence we have certain advertising rights for the purpose of exploiting those motion pictures. You asked me whether that was a form. That is very standard in the motion picture industry contracts, to cover the two things separately."

The plaintiff gave testimony to the same effect and his counsel does not dispute such interpretation.

Mr. Rittenberg further testified in substance, that the usual language when talking about ownership of pictures produced is the phrase *"acts, poses, plays and appearances"*; that *"name and likeness"* refers to advertising rights as distinguished from motion pictures; that there is a well understood distinction in the industry between the use of an artist's "name and likeness" in motion pictures and their use outside the picture. At no time on behalf of the plaintiff did any one request any limitation or restriction on the producer's right to use or distribute or transmit or exhibit the pictures which plaintiff would make.

Paragraph 4 of the 1936 contract granted plaintiff—

" * * * the express right to enter into any other engagements, and/or to render services in connection with vaudeville, personal appearances, radio broadcasts, phonograph records, or other forms of entertainment, .excepting motion pictures and television, outside of such Exclusive Periods, * *."

Under the provisions of paragraph 5 of the 1938 contract, plaintiff could, (except when in default), render services for others during the intervening periods—

" * * * in motion pictures, dramatic, theatrical, musical, vaudeville, radio, television, commercial advertising, making phonograph recordings, or other productions, shows, performances and/or entertainment; * *."

He was free to make one outside photoplay during each term of the contract.

Note that the term "commercial advertising" is used for the first time in the 1938 contract, and that the grant therein was broader than that found in paragraph 4 of the 1936 contract. (The latter preventing television appearances and not mentioning "commercial advertising".) It also will be observed that the parties have differentiated between television and "commercial advertising", indicating a recognition of a distinction in the meaning of the two words.

After dealing with each other for a period of twelve years we come to the contract of 1946, wherein photoplays are defined in paragraph 2 to include:

" * * * but is not limited to, motion pictures produced, exhibited with and/or accompanied by sound and/or voice recording, reproducing and/or transmitting devices, radio devices, television devices and all other improvements and devices which are now or may hereafter be used in connection with the production, exhibition and/or transmission of any present or future kind of motion picture productions. The words 'radio devices' and 'television devices' as used in the next preceding sentence hereof, shall be deemed to refer to radio devices and television de-vices only in connection with motion pictures, and not to radio devices and television directly from performances by living actors on the radio or in personal appearances. * * *"

In an appendix to the 1946 contract enumerated as paragraph 3 it is stated:

"You shall have no right, title or interest of any kind or character whatsoever in or to any photoplay, or any right or rights in connection with the same or in or to any proceeds which may be derived by us therefrom; it being distinctly understood and agreed that the compensation payable pursuant to the provisions of paragraph ——— of the agreement to which this exhibit is attached, shall be measured in the manner hereinabove provided and that such compensation shall not, in any way, constitute a lien upon any photoplay, or any part thereof, or an assignment of the proceeds thereof."

And paragraph 4 of said annex to the 1946 contract reads as follows:

"We shall have full charge and control of the manner in which and the terms under which each photoplay shall be distributed, exhibited and/or exploited, and all matters pertaining thereto, and the manner in which and the terms under which any of its rights may be sold or otherwise disposed of, including the right to adjust and settle all disputes with distributor or with any subsidiary, franchise holder, licensee, exhibitor and/or other persons and we may deduct from the gross receipts the amounts necessary to settle any such claims, and you shall have no voice or control whatsoever in connection with the foregoing. We agree to use our best efforts in obtaining booking for any photoplay in which you are entitled to percentage compensation at rentals consistent with the merit and box-office appeal of any such photo-play."

It is clear from the foregoing that the parties understood Republic had absolute ownership of the photoplays in controversy and that there was no restric-

tion upon the exhibition. The same films used for televising are used in the exhibition of photoplays in conventional motion picture theatres, and that being true I must hold Republic's unrestricted ownership rights of the films include the right to license their exhibition on home television receivers. See Vargas v. Esquire, Inc, 7 Cir., 164 F.2d 522; Lillie v. Warner Bros. Pictures, 139 Cal.App. 724, 34 P.2d 835, 837; Gautier v. Pro-Football, Inc., 278 App.Div. 431, 106 N.Y.S.2d 553; Crimi v. Rutgers Presbyterian Church, 194 Misc. 570, 89 N.Y.S.2d 813.

I may also note each of the contracts in issue states that the law of California is to govern their construction, but the sole California case cited, Lillie v. Warner Bros. Pictures, supra, would seem to preclude the discussion of matters beyond the contract itself. In Lillie v. Warner Bros. Pictures, supra, the District Court of Appeal of California stated:

"* * * By the contract respondent acquired a full ownership in the picture, subject only to the limitations contained in the contract. This ownership included the right to use the picture publicly in any form of exhibition, except as such right is limited by the terms of the contract. It seems clearly to follow that the exhibition of the scene as a short would not be a tortious invasion of the plaintiff's right of privacy. If wrong at all, it necessarily was only a breach of the contract." [139 Cal.App. 724, 39 P.2d 837.]

Plaintiff urges that the televising of the subject photoplays is "commercial advertising". The evidence discloses that "spot advertising" is common practice in most conventional motion picture theatres. Television is also punctuated with advertisements. In principle there is no practical difference. The photoplay is exhibited as an "attention getter". In the theatre it is a "captured" audience; in the home television viewers have a number of stations from which they may select their entertainment. Theatres compete on the basis of the picture they are exhibiting. Television advertisers compete with each other by the type of entertainment offered for the attention of potential television addicts, thereby providing those advertisers the opportunity to bring their wares to the attention of the television audience.

Plaintiff is not in position to complain because "spot advertising" appears on television screens any more than he would have control over advertisements in the conventional theatre. The advertisements are independent of the photoplays. The close proximity of said advertisements to the photoplay is something beyond the control of the plaintiff. It is a matter of common knowledge that pictures intermingled with advertisements flow constantly over the television screen. It is difficult to segregate one sponsor from the other, except where the advertisement is interwoven into and made a part of a television picture.

I cannot see any merit to plaintiff's claim of unfair competition. He contracted with Republic for his part in the photoplay in question and was paid therefor. The fact he now has his own producing company and advertising business, does not destroy Republic's ownership of the photoplays or restrict its use of them. Plaintiff may not approve the televising of his old photoplays. He may not wish to be plagued by the ghosts of the past. It might just as well be said that plaintiff is competing with his old employer as to claim that his old employer is competing with him. Both stand in the same position.

Republic made a substantial contribution to plaintiff's present drawing power. That being true why should Republic be denied the fruits of the labor of both plaintiff and defendant and the plaintiff be the sole beneficiary? To me the plaintiff's position is not only untenable but unfair in attempting to prevent Republic from enjoying its full share of the profits to be derived from said photoplays. It is a matter of common knowledge that radio, like newspapers and other advertising media, depends upon sponsors or advertisers for support. Only through such sponsors or advertisers could we maintain the freedom of the radio or press. When television became a practical medium of communication and expression, it was recognized as a competitor of the screen, radio and the press, and, if it is

going to be the product and a further bulwark of our free enterprise system, its programs must of necessity be sponsored by advertisers and accepted by them as a medium of advertising. It was in this climate that the 1942 and 1946 contracts were executed. To attempt now to graft on to the completed contracts additional restrictions, under the guise of unfair competition, that were not in contemplation of the parties at the time said contracts were executed, would, in my opinion, be manifestly unjust.

Plaintiff has introduced expert testimony in an attempt to demonstrate the harmful effect the televising of the photoplays involved will have upon his present activities. In my opinion such expert testimony is far-fetched, but even if true, it cannot affect the rights of Republic under the terms of its various contracts.

■ In this case parol testimony was offered and admitted not to vary the terms of the contract, but to explain the usage of various phrases as construed by the industry generally. No substantial evidence was offered indicating any ambiguity in the contracts. On the contrary the evidence indicates there was no ambiguity.

I was not concerned with the problem of a practical construction of the contracts for the reason that a present interpretation of said contracts was not sought until after the expiration and completion of those contracts.

■ Finally to boil this case down to substance, the plaintiff is seeking to prevent Republic from televising the photoplays in which plaintiff starred, his complaint being that sponsored televising of a photoplay is "commercial advertising". Plaintiff is attempting to do indirectly what he knows he cannot do directly—i. e. inducing the court to find that the present method of televising motion pictures is "commercial advertising". It is my view that television of motion pictures is a form of entertainment and not "commercial advertising".

As heretofore indicated, I find that the contracts place no restrictions upon Republic in the use of said films and that their contemplated use does not constitute unfair competition.

If plaintiff is worthy of his hire, certainly Republic is entitled to the full use of the fruits of his labor. Sawyer v. Crowell Pub. Co., D.C., 46 F.Supp. 471, affirmed 2 Cir., 142 F.2d 497, certiorari denied 323 U.S. 735, 65 S.Ct. 74, 89 L.Ed. 589; Grant v. Kellog Co., D.C., 58 F.Supp. 48, affirmed 2 Cir., 154 F.2d 59.

Defendants are entitled to judgment and are directed to submit proposed findings and judgment in accordance with the opinions herein expressed.